No. 23-2946

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

CENTER FOR BIOLOGICAL DIVERSITY,

*Plaintiff-Appellee,*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.*,

*Defendants-Appellants.*

On Appeal from the United States District Court for the District of Arizona
No. 4:22-cv-138
Hon. John Hinderaker

**APPELLEE CENTER FOR BIOLOGICAL DIVERSITY'S ANSWERING BRIEF**

Claire E. Tonry
Smith & Lowney PLLC
2317 E. John Street
Seattle, Washington 98112
(206) 860-2883
claire@smithandlowney.com

Hannah Connor
Center for Biological Diversity
1411 K Street NW, Suite 1300
Washington, DC 20005
(202) 681-1676
hconnor@biologicaldiversity.org

*Attorneys for Plaintiff-Appellee Center for Biological Diversity*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, the Center for Biological Diversity represents that it is a non-profit corporation with no outstanding shares or debt securities in the hands of the public and no parent, subsidiary, or affiliates that have issued shares or debt securities to the public.

DATED this 2nd day of December 2024.

s/Claire Tonry
Claire E. Tonry
*Attorney for Plaintiff-Appellee*

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................ i
TABLE OF CONTENTS ........................................ ii
TABLE OF AUTHORITIES ........................................ iv
LIST OF ACRONYMS ........................................ ix
INTRODUCTION ........................................ 1
JURISDICTIONAL STATEMENT ........................................ 3
ISSUES PRESENTED FOR REVIEW ........................................ 3
STATEMENT OF THE CASE ........................................ 4
I. Statutory and Regulatory Framework ........................................ 4
A. Endangered Species Act ........................................ 4
B. Clean Water Act ........................................ 7
II. Factual Background ........................................ 11
A. Cadmium is toxic to aquatic species ........................................ 11
B. EPA formally revised it 304(a) criteria for cadmium in 2016. ........................................ 12
C. EPA's failure to consult over its 2016 cadmium criteria contradicted its prior agreement and practice. ........................................ 13
III. Procedural Background ........................................ 14
IV. Effects of the District Court's Order ........................................ 15
SUMMARY OF THE ARGUMENT ........................................ 16
ARGUMENT ........................................ 18
I. Center for Biological Diversity Has Standing. ........................................ 18
A. The Center demonstrated injury in fact. ........................................ 19
B. EPA's criteria caused the Center's injury ........................................ 25
C. The Center's injury is redressable. ........................................ 28
II. EPA Violated the Endangered Species Act. ........................................ 31
A. Revising 304(a) cadmium criteria is an agency action. ........................................ 31
1. The ESA does not limit "agency action" to direct, on the ground agency conduct. ........................................ 32

2. This Court's precedent strongly supports finding that EPA's 304(a) criteria is an "agency action." ....36

3. Abiding by the statute's plain text will not require EPA to consult over press releases or other absurd results. ....41

B. EPA's 304(a) cadmium criteria "may affect" protected species, satisfying the "relatively low" threshold for consultation. ....44

1. EPA never made a "no effect" determination. ....44

2. The record shows that EPA's 304(a) cadmium criteria may affect protected species and designated habitat. ....46

3. EPA's "no effect" argument relies on an impermissible reading of the ESA twice rejected by the D.C. Circuit Court of Appeals....48

4. Uncertainty about exactly where and when project level effects will occur does not excuse EPA from consulting at the earliest practicable time.50

5. EPA relies on unpersuasive non-binding authority....52

C. The Services' long-held position and EPA's prior agreement to consult over its 304(a) criteria support consultation here....55

CONCLUSION ....57

STATEMENT OF RELATED CASES ....58

CERTIFICATE OF COMPLIANCE ....59

ADDENDUM.... A-1

## TABLE OF AUTHORITIES

### Cases

*Am. Fuel & Petrochemical Mfrs. v. EPA*, 937 F.3d 559 (D.C. Cir. 2019) ....................52, 53, 56, 57

*Arizona v. Yellen*, 34 F.4th 841 (9th Cir. 2022) ....................20

*ASARCO, Inc. v. Kadish*, 490 U.S. 605 (1989) ....................34

*Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687 (1995) ....5

*Bragdon v. Abbott*, 524 U.S. 624 (1998)....................38

*Cal. ex rel. Lockyer v. U.S. Dep't of Agric.*, 459 F. Supp. 2d 874 (N.D. Cal. 2006), *aff'd*, 575 F.3d 999 (9th Cir. 2009) ....................43

*Center for Biological Diversity v. United States HUD*, 359 F. App'x 781 (9th Cir. 2009) ....................63

*Citizens for Better Forestry v. U.S. Dep't of Agric.*, 481 F. Supp. 2d 1059 (N.D. Cal. 2007)....................44, 59

*Conner v. Burford*, 848 F.2d 1441 (9th Cir. 1988) ....................45, 46, 50, 59

*Cottonwood Environmental Law Center v. U.S. Forest Service*, 789 F.3d 1075 (9th Cir. 2015) ....................45, 46

*Ctr. for Biological Diversity v. Exp.-Imp. Bank of the United States*, 894 F.3d 1005 (9th Cir. 2018)....................30, 34

*Ctr. for Biological Diversity v. U.S. Dep't of Housing & Urban Dev.*, 541 F. Supp. 2d 1091 (D. Ariz. 2008) ....................63

*Ctr. for Food Safety v. Regan*, 56 F.4th 648 (9th Cir. 2022)....................28

*Defs. of Wildlife v. Hodel*, 707 F. Supp. 1082 (D. Minn 1989)....................38

*Department of Transportation v. Public Citizen*, 541 U.S. 752 (2004) ....................62

*Ecological Rights Found. v. Pac. Gas & Elec. Co.*, 874 F.3d 1083 (9th Cir. 2017) ....................................................................................................................21

*Environmental Defense Center v. Bureau of Ocean Energy Management*, 36 F.4th 850 (9th Cir. 2022), *cert denied*, 143 S. Ct. 2582 (2023) ........................42, 43, 46

*FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024) ..........................29

*Forest Guardians v. Forsgren*, 478 F.3d 1149 (10th Cir. 2007)............................44

*Friends of the Earth v. Laidlaw Envt'l Servs*., 528 U.S. 167 (2000) ..........21, 22, 26

*Gallardo v. Marstiller*, 596 U.S. 420 (2022)........................................................37

*Gonzales & Gonzales Bonds & Ins. Agency, Inc. v. U.S. Dep't of Homeland Sec.*, 107 F.4th 1064 (9th Cir. 2024)........................................................38, 65

*Growth Energy v. U.S. EPA*, 5 F.4th 1 (D.C. Cir. 2021)................................passim

*Haaland v. Brackeen*, 599 U.S. 255 (2023) ..........................................................34

*Hall v. Norton*, 266 F.3d 969 (9th Cir. 2001)........................................................32

*In re Ctr. for Biological Diversity & Ctr. for Food Safety*, 53 F.4th 665 (D.C. Cir. 2022) ................................................................................................................28

*Inland Empire Waterkeeper v. Corona Clay Co.*, 17 F.4th 826 (9th Cir. 2021), *cert. denied*, 142 S. Ct. 1444 (2022) ........................................................................25

*Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006 (9th Cir. 2012)........passim

*Lane County Audubon Society v. Jamison*, 958 F.2d 290 (9th Cir. 1992)........44, 58

*Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244 (2024)..................................38

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 569 (1992)...........................20, 29, 31, 34

*Marbled Murrelet v. Babbitt*, 83 F.3d 1068 (9th Cir. 1996) ............................41, 47

*N. Plains Res. Council v. U.S. Army Corps of Eng'rs*, 454 F.Supp.3d 985 (D. Mont. 2020)....................................................................................................50, 66

*Nat. Res. Def. Council v. Houston*, 146 F.3d 1118 (9th Cir. 1998).........................37

*Nat. Res. Def. Council v. U.S. EPA*, 38 F.4th 34 (9th Cir. 2022).....................passim

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644 (2007) 7, 27, 40, 41

*Pac. Rivers Council v. Thomas*, 30 F.3d 1050 (9th Cir. 1994) ............37, 43, 46, 58

*Sierra Club v. Marsh*, 816 F.2d 1376 (9th Cir. 1987)...........................................55

*Tenn. Valley Auth. v. Hill*, 437 U.S. 153 (1978) ............................................passim

*Thomas v. Peterson*, 753 F.2d 754 (9th Cir. 1985) ...............................................27

*U.S. v. $133,420*, 672 F.3d 629 (9th Cir. 2012) .............................................25, 26

*W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472 (9th Cir. 2011) ...........55, 65

*Wash. Toxics Coal. v. U.S. Dep't of Interior*, 457 F. Supp. 2d 1158 (W.D. Wash. 2006) ........................................................................................................26

*WildEarth Guardians v. U.S. Forest Serv.*, 70 F.4th 1212 (9th Cir. 2023).......30, 31

**Statutes**

16 U.S.C. § 1531(c)(1) ..........................................................................................4

16 U.S.C. § 1532 ......................................................................................................4

16 U.S.C. § 1536 ....................................................................................................41

16 U.S.C. § 1536(a)(1) ..........................................................................................4

16 U.S.C. § 1536(a)(2) ......................................................................................passim

16 U.S.C. § 1536(b)..............................................................................................5, 6

16 U.S.C. § 1536(c)..................................................................................................5

33 U.S.C. § 1251(a)..................................................................................................7

33 U.S.C. § 1311(b)................................................................................................10

33 U.S.C. § 1313 ....................7
33 U.S.C. § 1313(c) ....................passim
33 U.S.C. § 1313(d) ....................7, 10, 22
33 U.S.C. § 1314(a) ....................1, 3, 8
33 U.S.C. § 1341(a) ....................10
33 U.S.C. § 1342(a) ....................10
33 U.S.C. §1313(a) ....................7
38 Maine Rev. Stat. 420 ....................27
42 U.S.C. § 9621(d) ....................10, 40

**Federal Regulations**

40 C.F.R. § 131.11 ....................passim
40 C.F.R. § 131.20 ....................passim
40 C.F.R. § 131.38 ....................9
40 C.F.R. § 131.46 ....................27
40 C.F.R. § 131.5 ....................30
40 C.F.R. § 300.430 ....................10, 26, 40
50 C.F.R. § 17.3 ....................4
50 C.F.R. § 402.01 ....................5
50 C.F.R. § 402.02 ....................passim
50 C.F.R. § 402.03 ....................7
50 C.F.R. § 402.13 ....................6, 16
50 C.F.R. § 402.14 ....................6, 7, 16

**State Regulations**

Minn. R. 7050.0218 .......... 27

N.M. Admin. Code 20.6.4.13 .......... 27

**Other Authorities**

43 Fed. Reg. 870 .......... 33

51 Fed. Reg. 19,926 .......... 7

56 Fed. Reg. 58420 .......... 55

60 Fed. Reg. 22229 .......... 9

80 Fed. Reg. 51020 .......... 27, 40

81 Fed. Reg. 19,176 .......... 1

82 Fed. Reg. 9166 .......... 9, 26, 27

88 Fed. Reg. 29496 .......... 9, 53

Guidance on the Applicability of the Endangered Species Act's Consultation Requirements to Proposed Actions Involving the Emissions of Greenhouse Gases, M-37017 (Oct. 3, 2008) .......... 52

H. R. Rep. No. 1804, 95th Cong., 2d Sess. 18 (1978) .......... 33

U.S EPA, National Recommended Water Quality Criteria - Aquatic Life Criteria Table, https://www.epa.gov/wqc/national-recommended-water-quality-criteria-aquatic-life-criteria-table .......... 29

U.S. EPA, *Benefit and Cost Analysis for Proposed Supplemental Effluent Limitations Guidelines and Standards for the Steam Electric Power Generating Point Source Category*, EPA-821-R-23-003 (Feb. 28, 2023) .......... 11, 41

## LIST OF ACRONYMS

CERCLA – Comprehensive Environmental Response, Compensation and Liability Act

CWA – Clean Water Act

EPA – Environmental Protection Agency

ESA – Endangered Species Act

FWS – Fish and Wildlife Service

MOA – Memorandum of Agreement

NEPA – National Environmental Policy Act

NMFS – National Marine Fisheries Service

NPDES – National Pollutant Discharge Elimination System

## INTRODUCTION

In 2016, the Environmental Protection Agency ("EPA") significantly weakened a portion of its nationwide water quality criteria for the heavy metal cadmium under Section 304(a) of the Clean Water Act ("CWA"), 33 U.S.C. § 1314(a). ER-234–236 (81 Fed. Reg. 19,176). In doing so, EPA nearly tripled the chronic exposure levels for freshwater aquatic life from 0.25 to 0.72 parts per billion. *Id.* EPA admits it did not initiate, let alone complete, the required consultation process outlined in Section 7 of the federal Endangered Species Act ("ESA") before taking that action. *See* ER-249. EPA thus violated the ESA's procedural obligations and thwarted the ESA's substantive purpose of halting and reversing the trend toward extinction of imperiled wildlife.

EPA defied its obligations under the ESA despite significant concerns raised by the National Marine Fisheries Service ("NMFS"), one of the two expert wildlife agencies charged with implementing the ESA. ER-261. As NMFS explained during EPA's formal notice and comment period, EPA's failure to consult risks significant, compounding harm to endangered and threatened species. *Id.* According to NMFS, EPA's "piecemeal" approach of only consulting when states later adopt EPA's criteria as their own, rather than on the comprehensive, nationwide level, "leads to an incomplete consideration of the effects of the action that is legally vulnerable,"

and likely leads to violations of the ESA's prohibitions against harm or "take" of protected species. *Id.*

NMFS's concerns are warranted. The science is clear that cadmium is a highly toxic heavy metal that has no biological value—*i.e.* it is toxic to wildlife, as well as people, at any concentration. ER-111–113, 115. As NMFS highlighted for EPA, cadmium bioaccumulates in the food chain and can cause severe effects to threatened and endangered species, especially long lived and/or migratory species like sea turtles, salmon, and sturgeon, which are harmed by the buildup of this pollutant as they travel through waters across many states throughout their lifetimes. ER-259–261.

The administrative record and history of this issue demonstrate that consultation on EPA's nationwide water quality criteria is vital to identifying and addressing the true extent of harm to listed species. *See, e.g.*, ER-261. Indeed, instructively, the only time EPA submitted to such a consultation was on its nationwide cyanide water quality criteria, which resulted in draft biological opinions finding that EPA's criteria not only affected endangered species but would put hundreds of them in jeopardy of extinction. SER-211–213, 262. But rather than finishing that consultation and modifying its action to the benefit of endangered species, EPA abandoned it and has since refused to consult on any other water quality criteria, including the cadmium criteria at issue here. *See* ER-7.

At the core of its appeal, EPA argues that its establishment of water quality criteria—a Congressionally mandated activity that follows formal notice and comment obligations and requires "consultation with appropriate Federal and State agencies and other interested persons," 33 U.S.C. § 1314(a)—should not be considered an agency action subject to ESA consultation. For the reasons set forth below, this Court should reject EPA's novel, unsupported arguments and affirm the district court's decision.

## JURISDICTIONAL STATEMENT

The Center for Biological Diversity (the "Center") agrees with Appellants' statement of jurisdiction, except to the extent that Appellants allege that the Center lacks Article III standing. The Center fully addresses this assertion *infra* at pages 22–35.

## ISSUES PRESENTED FOR REVIEW

I. Does the Center have Article III standing to sue the EPA over its failure to consult the expert wildlife agencies National Marine Fisheries Service ("NMFS") and Fish and Wildlife Service ("FWS") before finalizing revisions to EPA's nationwide water quality criteria for cadmium under Section 304(a) of the Clean Water Act?

II. Did the EPA violate the Endangered Species Act ("ESA") when it formally revised nationwide water quality criteria for the highly toxic heavy metal

cadmium under Section 304(a) of the Clean Water Act without determining whether doing so "may affect" any endangered or threatened species or those species' critical habitats, or otherwise engaging in consultation with NMFS or FWS pursuant to Section 7 of the ESA?

## STATEMENT OF THE CASE

### I. Statutory and Regulatory Framework

#### A. Endangered Species Act

With the passage of the ESA, "Congress intended endangered species to be afforded the highest of priorities." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 174 (1978). Congress spoke clearly in its directive that "all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities" to do so, "whatever the cost." 16 U.S.C. § 1531(c)(1); *Tenn. Valley Auth.*, 437 U.S. at 184.

To achieve these goals, the ESA contains both substantive and procedural protections for endangered and threatened species:

Section 9 of the ESA prohibits the "take" of any endangered species by any person including federal agencies. 16 U.S.C. §§ 1536(a)(1), 1532(13). "Take" is defined broadly to include harm, indirect injuries, and significant habitat modification or degradation. 16 U.S.C. § 1532(19); 50 C.F.R. § 17.3; *see also*

*Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 700, 704 (1995).

Section 7 of the ESA prohibits federal agencies from taking actions that would be likely to "jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species…" 16 U.S.C. § 1536(a)(2).

Congress did not leave it up to the agency proposing to take an action ("action agency") to decide how to comply with the ESA's substantive protections. *Id.* Instead, Congress directed action agencies to "insure" compliance by consulting with the United States Fish and Wildlife Service ("FWS") and/or National Marine Fisheries Service ("NMFS") (together, "the Services"), the expert wildlife agencies charged with administering and interpreting the ESA. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.01(b). Congress dictated a specific consultation process wherein the action agency authors a "biological evaluation" stating whether any listed species in the action area are "likely to be affected." 16 U.S.C. § 1536(c). Then, the Service(s) author a "biological opinion" "detailing how the agency action affects the species or its critical habitat" and suggesting "reasonable and prudent alternatives" if needed to avoid jeopardizing species or adversely modifying their critical habitat. 16 U.S.C. § 1536(b)(3)–(4). And, even if the action will not cause jeopardy or adverse

modification, the Services must make specific findings and authorizations before any "take" can be allowed. *Id.*

The Services further interpreted the ESA in their joint regulations and Consultation Handbook. Per the regulations, federal agencies must consult with the Services "at the earliest possible time" whenever their actions "may affect" a listed species or designated critical habitat. 50 C.F.R. §§ 402.02; 402.14(a) and (b).

Both "agency action" and "may affect" are defined broadly to ensure compliance with the ESA's substantive protections. *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1021, 1027 (9th Cir. 2012).

"Agency action" includes "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies." 50 C.F.R. § 402.02. "Examples include but are not limited to . . . actions directly or indirectly causing modifications to the land, water, or air." 50 C.F.R. § 402.02(d).

Similarly, "may affect" determinations are based on "all consequences to listed species or critical habitat" that are caused by the action, "including the consequences of other activities that are caused by the proposed action" and effects that "may occur later in time." 50 C.F.R. § 402.02. If an agency action "may affect" *even just one individual member* of an endangered or threatened species, Section 7 consultation is required. *See* 50 C.F.R. §§ 402.13–402.14.

An action agency may avoid consultation only if (1) its action is non-discretionary or (2) the agency meets its burden to show the absence of effects on listed species and their critical habitats as a result of the action. *See Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644 (2007) (non-discretionary action); 50 C.F.R. §§ 402.03, 402.14(b)(1); *see also* 51 Fed. Reg. 19,926, 19,949 (June 3, 1986) (noting the burden of showing no effect is on the action agency).

**B. Clean Water Act**

The CWA aims to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters" by implementing water quality standards and regulating and ultimately eliminating the discharge of pollutants. 33 U.S.C. § 1251(a). EPA is responsible for administering the portions of the CWA related to establishing and reviewing water quality standards throughout the United States. *See* 33 U.S.C. § 1313. Water quality standards are set by individual states, tribes, and territories for water bodies within their jurisdictions, but are subject to EPA's approval for consistency with the requirements of the CWA. 33 U.S.C. §1313(a). The foundation of water quality standards is water quality criteria, which are used to develop pollutant discharge limitations in CWA permits and help states identify water bodies that are "impaired" due to high pollutant loads. *See, e.g.*, 33 U.S.C. § 1313(d); ER-106.

The CWA requires EPA to develop and publish national numeric water quality criteria for various pollutants, including for heavy metals like cadmium. 33 U.S.C. § 1314(a). These are referred to as "304(a) criteria" after the CWA section under which the criteria arise. *Id.* EPA must revise its 304(a) criteria "from time to time," and the criteria must "accurately reflect[] the latest scientific knowledge" relating to pollutants, their concentrations, and effects on receiving waters. *Id*. EPA has significant discretion in revising and updating its 304(a) criteria. *See*, *e.g.*, SER-25 ("[M]uch of the guidance [for developing water quality criteria] is necessarily qualitative rather than quantitative; much judgment will usually be required…").

The CWA requires states, territories, tribes, and other jurisdictions to review their own water quality standards every three years. 33 U.S.C. § 1313(c)(1); 40 C.F.R. § 131.20.[1] During these "triennial reviews," states are required to use any new or revised 304(a) criteria promulgated by EPA to set their own statewide standards, or else explain to EPA why they have chosen not to adopt its criteria. 40 C.F.R. §§ 131.11(b), 131.20(a). If the state does not utilize EPA's 304(a) criteria, it must establish its own criteria based on "[o]ther scientifically defensible methods," which must thereafter be approved by EPA following a robust review process. 40

[1] "States," as defined by EPA's regulations, encompasses all fifty states, the District of Columbia, Guam, the Commonwealth of Puerto Rico, the Virgin Islands, American Samoa, the Commonwealth of the Northern Mariana Islands, and certain eligible Indian Tribes. 40 C.F.R. § 131.3(j).

C.F.R. § 131.11(b)(1)(iii). The enormous amount of time and resources required to develop the requisite alternative water quality criteria results in "the vast majority of states" opting to use EPA's 304(a) criteria rather than expend the resources to develop their own. SER-244.

If a state's proposed water quality criteria pass CWA muster, EPA approves the state's criteria, which become incorporated into the state's federally enforceable water quality standards. 33 U.S.C. § 1313(c)(3). If, however, EPA determines that the state's proposed criteria would not be consistent with the goals and purposes of the CWA, EPA is to directly promulgate numeric criteria for that state. 33 U.S.C. § 1313(c)(4).

Every time EPA has directly promulgated cadmium criteria for a state, EPA has used its own 304(a) criteria to supplant the state's insufficient standards. *See, e.g.*, 60 Fed. Reg. 22229 (requiring 1995 cadmium criteria in twelve states, the District of Columbia, and Puerto Rico); 40 C.F.R. § 131.38(b)(1) (requiring 2001 criteria for California); 82 Fed. Reg. 9166, 9168 (requiring 2016 criteria for Oregon). EPA also recently proposed *all* of its 304(a) criteria become federal water quality standards for more than 250 Indian reservations' waters that currently do not have such standards in effect under the CWA. 88 Fed. Reg. 29496, 29499, 29506.

EPA's publication of 304(a) criteria is more than mere guidance; the criteria constitute a threshold condition that states must consider in establishing their water

quality standards. EPA thus has a heavy hand in the development of water quality standards across the nation, from updating and publishing 304(a) criteria to deciding whether to approve a state's proposed standards, and, if necessary, promulgating its own 304(a) criteria in their place.

Water quality standards, in turn, are used to develop CWA National Pollutant Discharge Elimination System ("NPDES") permit limits and serve as a basis for permit decisions. 33 U.S.C. §§ 1311(b)(1)(C), 1342(a)(1). They form the basis for assessing water quality, identifying impaired waters, and developing "total maximum daily loads," which are like pollution budgets for overly polluted water bodies. 33 U.S.C. § 1313(d). And they serve as a precondition for every federal permit or license for activity that may result in a discharge to navigable waters. 33 U.S.C. § 1341(a)(1).

In addition, EPA directly implements its 304(a) criteria for other federal regulatory purposes. For example, EPA relies directly on its 304(a) criteria to establish cleanup requirements for contaminated sites under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") and to support national effluent limitation guidelines for entire industrial sectors. 42 U.S.C. § 9621(d)(2)(A); 40 C.F.R. § 300.430(e)(5)(E); U.S. EPA, *Benefit and Cost Analysis for Proposed Supplemental Effluent Limitations Guidelines and Standards for the*

*Steam Electric Power Generating Point Source Category*, EPA-821-R-23-003, at 2-9–2-10 (Feb. 28, 2023).[2]

## II. Factual Background

### A. Cadmium is toxic to aquatic species.

The vast majority of aquatic cadmium pollution is human-made—derived from activities such as mining, industrial waste, and agricultural runoff. ER-111–113. Wildlife do not benefit from any amount of cadmium to perform their biological functions; rather, exposure to cadmium at any level is harmful, particularly to long-lived, freshwater, and broad-ranging species. ER-115–117; ER-260–261. Long-lived and migratory aquatic species like sturgeon, sea turtles, salmonids, and many varieties of freshwater mussels are just a few ESA-listed species that are especially sensitive to cadmium. ER-102–103; ER-247; SER-81; SER-33.

Acute (short-term) exposure to cadmium can lead to increased mortality. ER-115; SER-42, 62–64, 91–93. Over time, cadmium can accumulate in an animal's tissue, either through consumption of other organisms containing elevated levels of cadmium or through heightened concentrations of cadmium in the surrounding environment. *See* SER-58; ER-260. Such accumulation may result in adverse health effects in the long term, especially for long-lived and broad-ranging aquatic-

[2] NPDES permits must incorporate national effluent limit guidelines. 33 U.S.C. §§ 1311, 1314.

dependent species, even where ambient levels of cadmium in surrounding waters are not immediately harmful. ER-260. Symptoms of chronic (long-term) cadmium exposure on species include adverse effects on growth, reproduction, immune and endocrine systems, development, and behavior. ER-115.

### B. EPA formally revised it 304(a) criteria for cadmium in 2016.

In 2016, EPA updated all four categories of its 304(a) cadmium criteria for the protection of aquatic life: (1) acute freshwater, (2) chronic freshwater, (3) acute estuarine/marine waters, and (4) chronic estuarine/marine waters. *See* ER-104–105. Each category sets forth a standard for the maximum allowable cadmium concentration in the designated water type. ER-107. In its 2016 revisions, EPA decreased the maximum allowable cadmium concentrations from its previous 2001 criteria in three of the four categories: acute freshwater and both acute and chronic estuarine/marine waters. ER-105 (Table 1). However, EPA nearly tripled the chronic concentration for freshwater, weakening protections from cadmium exposure for freshwater species. ER-105.[3]

EPA chose to forego consultation at the national level when revising and publishing its new 304(a) cadmium criteria, and instead only consults on its state-

[3] In 2001, EPA's 304(a) cadmium criteria for chronic concentrations in freshwater was 0.25 μg/L, which is a concentration of 0.25 parts per billion. *See id*. EPA's 2016 chronic freshwater cadmium criteria increased the maximum allowable concentration to 0.72 μg/L. *Id*.

level approvals of water quality standards. ER-249. In response to public comments calling for nationwide consultation, EPA opined that such consultation would not be "efficient" and questioned whether it would "necessarily be protective of listed species." *See id*.

NMFS in particular raised pointed concerns about impacts to threatened and endangered species flowing from EPA's refusal to engage in nationwide consultation on its 2016 cadmium criteria. ER-259–261; SER-49–81. In a formal comment letter during EPA's public notice and comment period for its 304(a) criteria, NMFS explained that "EPA's reliance on ESA section 7 consultation only when the agency approves state proposed water quality criteria results in a piecemeal approach when considering implications of such guidelines for broadly ranging species." ER-261. NMFS warned EPA that such "segmentation of an action under ESA section 7 leads to an incomplete consideration of the effects of the action that is legally vulnerable." *Id*. NMFS also raised specific concerns regarding harmful impacts to corals, smalltooth sawfish, sea turtles, sturgeons, and salmon. ER-260–261. EPA dismissed these concerns by referring back to its "efficiency" rationale. *See* ER-252; ER-249.

### C. EPA's failure to consult over its 2016 cadmium criteria contradicted its prior agreement and practice.

In 2001, EPA and the Services entered into a Memorandum of Agreement ("MOA") that detailed EPA's agreement to undergo nationwide consultation on its

304(a) criteria at the time they were developed and published. SER-187–202. The purpose of the MOA was to "ensure a consistent approach to evaluating the effects of pollutants on species and identifying measures that may be needed to better protect them," including for species that range across state boundaries, and generally to ensure sufficiently protective criteria for endangered and threatened species. SER-197.

Following the MOA, the Services and EPA engaged in the first nationwide consultation process over EPA's proposed 304(a) criteria for cyanide, which, like cadmium, is a toxic heavy metal. SER-207–209, 227–228. However, after the Services issued draft Biological Opinions finding that EPA's proposed cyanide criteria were likely to jeopardize hundreds of ESA-listed species, EPA ended the consultation process before it was complete. SER-211–13, 262. EPA did not initiate nationwide consultation for any other pollutant, though the MOA remains in effect. *See* SER-211–213; ER-7.

## III. Procedural Background

In an effort to address the harm caused to listed species by EPA's failure to consult, the Center brought suit under Section 7 of the ESA in March 2022, challenging EPA's failure to engage in nationwide consultation when revising its 304(a) cadmium criteria in 2016. ER-262–292. The Center moved for summary judgment on its ESA claim, requesting that the district court vacate EPA's less

stringent chronic freshwater cadmium criterion and remand all four of the 2016 criteria to EPA for consultation with the Services. *See* ER-4. EPA cross-moved for summary judgment, arguing that the Center lacked standing and defending its failure to consult. *See* ER-9–28.

In August 2023, the district court granted the Center's motion for summary judgment in part, denied EPA's cross-motion for summary judgment, and granted the Center's requested relief: partial vacatur and remand of the 2016 cadmium criteria. ER-4–31. Finding that that EPA's failure to consult was a serious violation of the ESA, that the risk to the environment of leaving the criterion in place was high, and that EPA was unlikely to adopt the same rule on remand, the district court determined that vacatur of the 2016 304(a) chronic freshwater cadmium criteria was warranted. ER-29, ER-31.

EPA timely filed a notice of appeal, but only pursued this appeal after extensive delays and multiple deadline extension. ECF Nos. 14, 16, 18.

## IV. Effects of the District Court's Order

The effects of the district court's vacatur order were immediate: with the 2016 chronic freshwater cadmium criterion vacated, the more stringent 2001 criterion took its place. *See* ER-29.[4] As a practical matter, the ruling means that states that

[4] *See also* U.S EPA, National Recommended Water Quality Criteria - Aquatic Life Criteria Table, https://www.epa.gov/wqc/national-recommended-water-quality-

were in the process of their triennial water quality standards review at the time of the district court's order or thereafter would be required to explain any departures from the more-protective 2001 chronic freshwater cadmium criterion. *Id.* In the meantime, all four categories of the 2016 304(a) cadmium criteria were remanded to EPA for proceedings consistent with the court's finding that the criteria "may affect" protected species. ER-28; ER-30–31. As detailed above, determination that an agency action "may affect" even just one endangered or threatened species triggers the Section 7 consultation requirement. 50 C.F.R. §§ 402.13–402.14. And, as EPA itself has admitted in response to public comment and in this litigation, nationwide consultation would "tend to produce" more stringent 304(a) criteria. ER-8, 249. The relief ordered by the district court can therefore be expected to result in more protective standards and tighter pollution controls, to the benefit of listed species nationwide and the Center's members with interests in these species.

## SUMMARY OF THE ARGUMENT

The district court correctly held that the Center has standing, and that EPA violated the ESA. ER-17; ER-28. By the time the Center filed suit, EPA's weakened cadmium criteria were being implemented as binding law for a variety of regulatory purposes across the country, both by EPA directly and by dozens of states that

---

criteria-aquatic-life-criteria-table (noting the district court's vacatur order and directing the reader to the 2001 304(a) criteria).

adopted the criteria verbatim. SER-7–11. The affected area includes many waterways that the Center's members use for recreation and research—the very places they go to seek out and enjoy protected species like sturgeon, sea turtles, salmon, and many others. *See* ER-32–95 (Center's members' declarations). Had EPA consulted the expert wildlife agencies, the pollution standards for these waters would likely have been more stringent, inuring to the benefit of imperiled species and the Center's members who enjoy them. ER-29. These simple facts satisfy the well-settled tests for Article III standing and ESA Section 7 consultation requirements.

EPA's contrary argument ignores the facts and the law. First, EPA pretends there is some attenuated chain of causation when the record shows a direct line from EPA's issuance of cadmium criteria in 2016 to weaker standards in endangered species habitat all over the country. *See* ER-289–290. This is consistent with how EPA's 304(a) criteria have played out for decades, and it is by EPA's and Congress's own design under the CWA. SER-7–11; 33 U.S.C. § 1313(c)(2); 40 C.F.R. §§ 131.11(a) and (b). EPA's speculation that it might have turned out differently than it did, or than it ever has, does not defeat standing or undermine the need for ESA consultation—neither of which require an iron-clad certainty of specific environmental harm.

Perhaps recognizing that it cannot overcome the facts in the record, EPA proffers an untenable interpretation of the ESA term "agency action." *See* EPA Br. at 36–44. No court has ever endorsed EPA's statutory construction, which appeared out of thin air for the first time in its appellate brief. Rather, the plain text of the statute, longstanding regulations, and decades of precedent from this Court and the Supreme Court all foreclose EPA's interpretation. *See infra*, pages 35–47.

The Court should therefore affirm the district court's decision to vacate weaker cadmium criterion and remand all four criteria to EPA so EPA can consult with the wildlife experts as required by the ESA. ER-30–31. That outcome is exactly what EPA itself agreed was appropriate when it entered into its MOA with the Services to engage in nationwide consultation over its 304(a) criteria, including for cadmium. *See* SER-190, 197.

## ARGUMENT

### I. Center for Biological Diversity Has Standing.

The district court correctly found that the Center has Article III standing.[5] ER-17. The elements of standing—injury, causation, and redressability—are all

[5] The Center asserts an injury on behalf of its members and thus needed to show "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Nat. Res. Def. Council v. U.S. EPA*, 38 F.4th 34, 54 n.16 (9th Cir. 2022) (hereafter "*NRDC v. EPA*"). Because EPA does not contest prongs (b) and (c), the Center follows this Court's lead and focuses its analysis on (a). *See id.*

evaluated as of the time the plaintiff files suit. *Arizona v. Yellen*, 34 F.4th 841, 848 (9th Cir. 2022) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 569 n.4, (1992) ("[S]tanding is measured at the time of the complaint.")). By the time the Center filed its complaint in this case, EPA's 2016 304(a) criteria had already resulted in weakened water pollution control across the country, including in endangered and threatened species' habitat the Center's members frequent. *See* ER-289–290. The record shows that this happened because: (1) EPA revised its criteria without the Services' input on harms to protected species, and (2) the resulting, under-protective criteria were implemented by EPA directly or, following EPA's specific permission, by numerous states that adopted EPA's criteria verbatim. ER-249; SER-7–11. That is how EPA's 304(a) criteria have played out for nearly forty years. *See* SER-7–11. The theoretical possibility that states might have broken with this decades-long pattern—and received EPA's approval to do so—does not defeat standing. The Court should reject EPA's hypothetical and counterfactual standing arguments.

**A. The Center demonstrated injury in fact.**

The "relevant showing" a plaintiff must make for purposes of Article III standing "is not injury to the environment but injury to the plaintiff. To insist upon the former rather than the latter . . . is to raise the standing hurdle higher than the necessary showing for success on the merits . . .." *Friends of the Earth v. Laidlaw Envt'l Servs.*, 528 U.S. 167, 181 (2000); *see also Ecological Rights Found. v. Pac.*

*Gas & Elec. Co.*, 874 F.3d 1083, 1094 (9th Cir. 2017) (whether pollution levels are "actually significant enough to harm the affected area" is "not a standing question"). To demonstrate associational standing, it is sufficient for members of non-profit organizations such as the Center to set forth their "reasonable concerns about the effects of [the challenged activity]" and how that activity "directly affected those [members'] recreational, aesthetic, and economic interests." *Laidlaw*, 528 U.S. at 183-84.

The Center's members have diverse and concrete interests in endangered and threatened species adversely affected by EPA's 304(a) cadmium criteria. *See, e.g.*, ER-49–58 (Declaration of Catherine Kilduff); ER-71–76 (Declaration of Martin Hamel). Members routinely engage in educational and recreational activities for the purpose of observing and enjoying ESA-listed species such as Atlantic sturgeon, sea turtles, Atlantic salmon, shortnose sturgeon, pallid sturgeon, green sturgeon, Chinook salmon, coho salmon, steelhead trout, many varieties of freshwater mussels, and hellbender salamanders. *See* ER-88–89, 79–80, 74–75, 69, 53–54, 46, and 37–38. Elevated cadmium concentrations in our nation's waters cause long- and short-term harm to these and many other species, thereby injuring the Center and its members by diminishing their ability to pursue their recreational, educational, aesthetic, and scientific interests in these species. *Id*.

For example, Center member Kristen Carden enjoys recreating along the Kennebec and Androscoggin rivers in Maine, home to multiple ESA-listed sturgeon species and the only remaining populations of Atlantic salmon in the United States, listed as endangered under the ESA. ER-78–81. However, EPA's failure to properly address impacts of cadmium pollution on these fish makes it harder for Ms. Carden to observe, photograph, and enjoy these fish with her children, and prevents them from swimming and recreating in affected waters. ER-80.

Another Center member, Kemp Burdette, lives, works, and frequently recreates on and around the Cape Fear River watershed in North Carolina as well as waterways across the southeastern United States. ER-83–85, 88–95. Mr. Burdette has worked extensively to reduce cadmium pollution in the Cape Fear watershed from coal-fired power plants—something EPA's weakened criteria, which are in effect in North Carolina—threaten to undo. ER-84–86. Likewise, EPA's action is harming Mr. Burdette's interests in seeing sea turtles, sturgeon, and other wildlife he prizes, in their habitats which are downstream of more than a dozen industrial facilities that discharge cadmium subject to CWA permits. ER-91–92.

The Center's members' interests are "undeniably cognizable interests for [the] purpose of standing," and the consultation procedures the Center "claims were required but not completed are intended to protect these types of interests." *NRDC*

*v. EPA*, 38 F.4th at 54 (cleaned up); *see also* ER-32–95. "Accordingly, the injury-in-fact requirement is met." *Id.*

And, while the Center need not demonstrate injury to the environment, the record here does show that cadmium pollution at the levels contemplated by EPA's 304(a) criteria poses risks to threatened and endangered aquatic species in which the Center's members are interested. SER-82–84 (California and Oregon salmonids and sturgeon); SER-120 (New England sturgeon, sea turtles, and whales); SER-153 (south Atlantic sturgeon); ER-260–261 (sea turtles and sturgeon). At EPA's behest, and without consideration of cumulative, inter-state harms to species, these criteria are being implemented across the nation where they dictate pollution discharge standards and cleanup efforts. *See* SER-7–11; *see also* 33 U.S.C. §§ 1313(c)(2), (d)(1)(C). Indeed, by the time the Center filed suit, EPA's 2016 cadmium criteria were being implemented in at least 29 jurisdictions, including Oregon, Maine, Georgia, Kentucky, North Carolina, and about 20 other states where the Center's members enjoy spotting, photographing, and recreating among endangered species. *See* SER-7–11, 103–104, 106–111, and 117–119.[6] This Court has "routinely found such evidence sufficient to establish Article III standing." *Inland Empire*

[6] At least one other state, California, would have updated its vastly outdated and under-protective cadmium criteria that EPA imposed on it decades ago if EPA had considered the risks to threatened and endangered fish and promulgated more stringent criteria. ER-68; SER-82–84.

*Waterkeeper v. Corona Clay Co.*, 17 F.4th 826, 832 (9th Cir. 2021), *cert. denied*, 142 S. Ct. 1444 (2022). And while yet more states were and are poised to do the same, *see* SER-7–11, there is no need to speculate because it had already occurred by the time the Center filed suit. *See* ER-289–90.

The Center's members' detailed declarations about the specific places they go to seek out, photograph, study, and otherwise enjoy particular species, and the extensive record evidence showing the adverse impacts of cadmium at the relevant concentrations to those species, are plenty sufficient for standing purposes. *See* ER-88–89, 79–80, 74–75, 69, 53–54, 46, and 37–38; SER-82–84 (California and Oregon salmonids and sturgeon); ER-260–261 (sea turtles and sturgeon); SER-120 (New England sturgeon, sea turtles, and whales); SER-153 (south Atlantic sturgeon). Tellingly, EPA's only authority for its contention that these are insufficient "generalized assertions" is an inapposite case about civil forfeiture. EPA Br. at 26 (citing *U.S. v. $133,420*, 672 F.3d 629, 638 (9th Cir. 2012)). In that case, the Court held that a bare statement that the claimant "had an 'ownership *and/or* a possessory interest'" was not sufficiently specific. *U.S. v. $133,420*, 672 F.3d at 638–39 (emphasis added). The Center's members' declarations have no such equivocation.

EPA's unsupported assertion that its 304(a) criteria should be good enough for endangered and threatened species does not undermine the Center's Article III injury, either. *See* EPA Br. at 26–29. The Center need only show that "exposing

those species to toxic" pollution threatens one or more of its members' interests, *NRDC v. EPA*, 38 F.4th at 54, which it has done. The Center need not demonstrate injury to the environment. *Laidlaw*, 528 U.S. at 181.

Furthermore, the record shows that EPA's criteria are *not* sufficiently protective of endangered and threatened species. First, EPA only looked at data on ten species. EPA Br. at 26–27. EPA did not consider any data for most of the hundreds of listed species, including corals, salamanders, sea turtles, or most other species in which the Center's members have interests. ER-102–103 (noting total lack of chronic toxicity data for marine species); ER-209–210. Second, EPA evaluated impacts using a process that "is not adequate and does not use the best available information or scientific methodology with respect to protecting listed species." *Wash. Toxics Coal. v. U.S. Dep't of Interior*, 457 F. Supp. 2d 1158, 1191–93 (W.D. Wash. 2006); *see also* ER-135 (noting reliance on same database and process). As EPA itself points out, NMFS found that the 2016 criteria are likely to adversely affect multiple of these very species. EPA Br. at 28. Moreover, NMFS strongly cautioned that only a comprehensive nationwide consultation would capture the true extent of adverse effects, especially on far-ranging, long-lived species like sturgeon and sea turtles. ER-261.

EPA's self-serving conclusion that its criteria are good enough merits no deference. *Karuk Tribe*, 681 F.3d at 1017 (an agency's interpretation of a statute

outside its administration is reviewed de novo); *Nat'l Ass'n of Home Builders*, 551 U.S. at 683 (Stevens, J. dissenting on other grounds) (noting that the Services, not EPA, are charged with implementing the ESA and therefore EPA receives no deference). And if a federal agency can unilaterally determine how the ESA must be interpreted as a shield for standing, then no court would ever have jurisdiction over suits to enforce any procedural aspect of the ESA, which is clearly not the law. *See, e.g., Thomas v. Peterson*, 753 F.2d 754, 764 (9th Cir. 1985) (without strict adherence to its procedural requirements, "there can be no assurance that a violation of the ESA's substantive provisions will not result."). Indeed, EPA "has made a habit" of improperly deciding Section 7 consultation is not required, only to be corrected by the courts. *In re Ctr. for Biological Diversity & Ctr. for Food Safety*, 53 F.4th 665, 668 (D.C. Cir. 2022); *see also Ctr. for Food Safety v. Regan*, 56 F.4th 648, 672 (9th Cir. 2022) (Miller, J. dissenting as to remedy) (noting EPA's "long history of violating the ESA").

**B. EPA's criteria caused the Center's injury.**

In a suit to enforce a procedural violation of the Section 7 consultation requirements, "[t]he causation requirement is satisfied by showing a 'reasonable probability of the challenged action's threat to [the petitioner's] concrete interest.'" *NRDC v. EPA*, 38 F.4th at 54. The Center easily meets this requirement through evidence that (1) EPA is implementing its criteria directly across the nation, as are

some 25 states, including Oregon, where EPA directly promulgated the criteria itself; and (2) NMFS determined that pollution at this level is likely to adversely affect multiple species in which the Center's members have concrete interests. *See* SER-7–11; 82 Fed. Reg. 9166, 9168; ER-260–61.

Where EPA is directly mandating its 2016 criteria for binding, regulatory purposes, traceability is easily met. *E.g.*, 82 Fed. Reg. 9166, 9168 (EPA requiring its 2016 criteria for Oregon); 40 C.F.R. § 300.430(e)(5)(E) (using criteria for cleanup standards). And, in the 29 states, territories, and tribal jurisdictions that already adopted EPA's 2016 cadmium criteria verbatim and received EPA's approval, "those choices have been" made, dispelling any doubt about third-party responses to EPA's action and satisfying causation. *Lujan*, 504 U.S. at 562; SER-7–11. This case is thus easily distinguished from *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 388 (2024), where the plaintiffs could not identify a single instance of their fears materializing.

But for the district court's vacatur, the same choice would likely be made by most of the remaining states, too, because the CWA and EPA's regulations require states to review their criteria every three years and either adopt EPA's new 304(a) criteria or mount a scientific defense for their own criteria *and* win EPA's approval of the same, which states have rarely ever done in the past forty years. *See* SER-7–

11; 40 C.F.R. § 131.20; 80 Fed. Reg. 51020, 51028.[7] EPA also retains authority to promulgate its own water quality standards for states, and to veto state permits and plans that fail to ensure compliance with the water quality criteria. *See, e.g.*, 40 C.F.R. § 131.46.[8] EPA is thus an "integral participant" in every step of the process of setting and implementing water quality criteria, *Ctr. for Biological Diversity v. Exp.-Imp. Bank of the United States*, 894 F.3d 1005, 1013 (9th Cir. 2018), and employs its authority to "cajole, coerce, [and, if needed,] command" implementation of its 304(a) criteria nationwide. *WildEarth Guardians v. U.S. Forest Serv.*, 70 F.4th 1212, 1217 (9th Cir. 2023) (citation omitted). Causation is satisfied for these additional reasons.

Accordingly, EPA's reliance on *WildEarth Guardians v. U.S. Forest Service* is also misplaced. In that case, the Court held that the state's discretionary decisions to sometimes kill wolves that preyed on livestock were not fairly traceable to the Forest Service's oversight of livestock grazing in the national forest. *Id.* at 1213–14.

---

[7] Several state laws and regulations likewise mandate adoption of EPA's 304(a) criteria or impose additional hurdles to deter deviations from EPA's criteria. *See, e.g.*, 38 Maine Rev. Stat. 420(2.A) (requiring state to adopt EPA's 304(a) criteria); N.M. Admin. Code 20.6.4.13(3) (EPA's 304(a) criteria automatically apply if state has not adopted its own standards); Minn. R. 7050.0218(4)(C) (establishing presumption that EPA's 304(a) criteria will be adopted and imposing notice and hearing requirements before different criteria may be used in discharge permit limits).

[8] *See also, e.g.*, 82 Fed. Reg. 9166, 9168 (EPA promulgating 304(a) cadmium criteria for Oregon).

The Court's analysis hinged on the fact that the Forest Service "does not regulate or participate in the killing of wolves" and therefore it had no "determinative or coercive effect" on the harmful conduct, which was the product of the state's "unfettered" exercise of "broad and legitimate discretion." *Id.* at 1214, 1218. Here, in contrast, EPA directly implements its criteria as controlling law for several purposes, and it plays a coercive and often determinative role in states' adoption and implementation of criteria. *See* ER-20–21.

**C. The Center's injury is redressable.**

Finally, the Center has satisfied the redressability prong because it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (quotation marks omitted). "When petitioners allege a procedural violation [such as failure to consult under Section 7], the redressability prong is satisfied by showing that the agency decision 'could be influenced' by the procedures at issue." *NRDC v. EPA*, 38 F.4th at 56 (quoting *Hall v. Norton*, 266 F.3d 969, 977 (9th Cir. 2001)). Here, NMFS's comment letter on the 2016 cadmium criteria and its draft Biological Opinions for EPA's 304(a) cyanide criteria illustrate just how consultation could influence or even require EPA to revise its 304(a) criteria to be more protective of endangered and threatened species. ER-260–261; SER-263–265 (prohibited "take" to be avoided with "revised criteria concentrations."). If EPA complies with the legal requirements of the ESA, its

criteria for cadmium would have to take into account the conclusions of the Services, which have already expressed serious concerns with EPA's criteria. *See, e.g.*, ER-260–261; SER-55–57. And again, EPA itself admitted that nationwide consultation would "tend to produce" more stringent 304(a) criteria. ER-8, 249.

Vacatur of the less stringent cadmium criterion also provides a meaningful and immediate interim remedy. ER-29. Upon vacatur, the standard for various EPA regulatory programs automatically reverted to the previous, more stringent level. *Id*; *see also* U.S EPA, National Recommended Water Quality Criteria - Aquatic Life Criteria Table, https://www.epa.gov/wqc/national-recommended-water-quality-criteria-aquatic-life-criteria-table. EPA's regulations require states to meaningfully consider adopting the more stringent criterion as they cycle through their triennial review process. 40 C.F.R. § 131.20(a). Vacatur also makes it so those states that already had the more stringent criterion in place are not cajoled into weakening their existing water quality laws. *See id.* (states must consider any new or revised 304(a) criteria that EPA has published since the last triennial review).

EPA's argument against redressability essentially reprises its causation argument and fails for the same fundamental reasons. For example, EPA argues that states have "unfettered" discretion to adopt whatever water quality criteria they please, and "EPA is without authority to require states to adopt new [water quality standards]." EPA Br. at 33-34. That is patently untrue. States must adopt EPA's

304(a) criteria or proffer the science to convince EPA that different criteria are adequately protective of aquatic species. 40 C.F.R. §§ 131.11(b), 131.20. EPA then approves or disapproves. 40 C.F.R. § 131.5. If EPA disagrees, it has explicit authority to promulgate its own criteria for that state. 33 U.S.C. § 1313(c)(4). Decades of this regulatory scheme playing out demonstrate that it is "likely," and not merely speculative, that more stringent 304(a) criteria will be implemented across the country and thus the Center's "injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561; SER-7–11.

Here again, EPA's case law is inapposite. EPA cites *Haaland v. Brackeen*, which, much like *WildEarth Guardians v. U.S. Forest Service*, was a suit against federal actors over a program and decisions that are carried out solely by state courts and state officials. 599 U.S. 255, 292-93 (2023). The plaintiffs in *Brackeen* sought a declaratory judgment that provisions of the Indian Child Welfare Act are unconstitutional in hopes that one day, state courts might see it as persuasive authority in future cases. *Id.* Here, in contrast, the Center sought relief that would directly alter the federal criteria that the federal defendant implements in a variety of ways. ER-28–30. The other cases EPA cites turned on a case-specific lack of evidence that incremental changes in the level of government funding would translate into particular benefits for taxpayers or jettison a major construction project mostly funded by other means. *ASARCO, Inc. v. Kadish*, 490 U.S. 605, 614-15

(1989) (no evidence that increasing general fund would lower taxes or raise teacher salaries); *Exp.-Imp. Bank*, 894 F.3d at 1014 (project likely to continue without loan). But here there is ample evidence that revising 304(a) criteria will translate into revised pollution controls on the ground. After all, the last time EPA revised its cadmium criteria, 25 states and several other jurisdictions adopted them verbatim within a few years. SER-7–11.

## II. EPA Violated the Endangered Species Act.

### A. Revising 304(a) cadmium criteria is an agency action.

The district court correctly held EPA's issuance of revised cadmium 304(a) criteria to be an "agency action" under Section 7 of the ESA. ER-25–26. The statute defines "agency action" broadly as "any action authorized, funded, or carried out, in whole or in part, by" a federal agency. 16 U.S.C. § 1536(a)(2). EPA's revision of its 304(a) criteria through public notice and comment and publication in the Federal Register, as well as its utilization of its 304(a) criteria in a variety of ways, show its action here to be all of those things. *See* ER-234–36. EPA openly concedes that "EPA's conduct was: (1) 'affirmative' and (2) 'discretionary,'" EPA Br. at 35, thereby satisfying the only other remaining prongs for triggering the consultation requirement. *Karuk Tribe*, 681 F.3d at 1011, 1020–21.

EPA's only defense relies on a novel reinterpretation of Section 7 that is contrary to the statutory text, regulations, and case law. The Court should reject it.

### 1. The ESA does not limit "agency action" to direct, on the ground agency conduct.

Nothing in the ESA's broad consultation mandate supports EPA's attempt to limit "agency action" to a subset of actions consisting of *direct* "authorization, funding, or implementation of some underlying conduct in the physical world." EPA Br. at 36, 38 (arguing "carried out" means agency employees must themselves perform physical labor like building a bridge). Far from being the "best," EPA's interpretation is untenable for several reasons.

*First*, Congress' use of the phrase "any action" is incompatible with EPA's argument. 16 U.S.C. § 1536(a)(2). EPA would insert significant limiting language where Congress used none. For example, EPA repeatedly uses the phrase "physical world" as though it were a term of art from the statute. *See, e.g.*, EPA Br. at 23, 36–38. But that phrase does not appear in Section 7. *See* 16 U.S.C. § 1536(a)(2). Nor does the statute limit agency actions to those that are "directly" carried out by the agency itself. EPA's attempt to insert these limiting phrases into the ESA would exempt major categories of agency actions from the consultation requirement, which flies in the face of Congress' intent in using broad language and "affording endangered species the highest of priorities." *Tenn. Valley Auth.*, 437 U.S. at 194. Indeed, "[f]ollowing the Supreme Court's lead," the Ninth Circuit has "repeatedly held that the ESA's use of the term 'agency action' is to be construed broadly." *Karuk Tribe*, 681 F.3d at 1021 (citing *Tenn. Valley Auth. v. Hill*, 437 U.S 153, and

collecting Ninth Circuit cases including *Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1055 (9th Cir. 1994)); *see also Nat. Res. Def. Council v. Houston*, 146 F.3d 1118, 1125 (9th Cir. 1998) ("The term 'agency action' has been defined broadly."). Accordingly, "the Court must give effect to, not nullify, Congress' choice" not to include limiting language. *Gallardo v. Marstiller*, 596 U.S. 420, 422 (2022).

*Second*, ESA implementing regulations foreclose EPA's interpretation. The expert wildlife services' regulations clearly state that "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies" are "actions" for purposes of Section 7. 50 C.F.R. § 402.02. "Examples include but are not limited to . . . actions directly or indirectly causing modifications to the land, water, or air." 50 C.F.R. § 402.02(d). The Services promulgated this regulatory language before Congress enacted the modern version of the ESA, it was endorsed by Congress when it amended the statute in 1978, and it has remained consistent for over forty-five years. 43 Fed. Reg. 870, 871 (Jan. 4,1978); H. R. Rep. No. 1804, 95th Cong., 2d Sess. 18 (1978).[9] It is, therefore, particularly strong evidence of the correct interpretation of the ESA. *See, e.g.*, *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2262 (2024); *Bragdon v. Abbott*, 524 U.S. 624, 632 (1998); *Gonzales &*

[9] *See also Defs. of Wildlife v. Hodel*, 707 F. Supp. 1082, 1085-86 (D. Minn 1989) (noting congressional approval of Section 7 regulations); 51 Fed. Reg. 19926, 19928 (June 3, 1986) (same).

*Gonzales Bonds & Ins. Agency, Inc. v. U.S. Dep't of Homeland Sec.*, 107 F.4th 1064, 1085 (9th Cir. 2024) (Johnstone, J. concurring).

The action challenged here fits squarely within this regulatory definition: EPA's issuance of nationwide 304(a) water quality criteria is an activity that directly and indirectly causes modifications to water. 50 C.F.R. § 402.02. As detailed above, EPA: directly implements the criteria in its federal cleanup program; uses them in setting binding nationwide pollution control standards; directly promulgates them as legally binding water quality standards in certain states and on many tribal lands; and incentivizes all states, tribes, and territories to adopt them and then codifies them into federal law when they do. *See supra*, pages 12–14.

Despite EPA's brazen arguments, the capacious regulatory language does not support EPA's narrow interpretation. Incredibly, EPA argues that "[t]he specified examples [in the regulation] make clear that the statute does *not* reach all activities." EPA Br. at 40. But the regulation expressly states that it *does* encompass "*all* activities or programs of *any* kind," and makes clear that the enumerated examples are not exclusive. 50 C.F.R. § 402.02 (emphasis added). And yes, the regulation's last example includes a causal link between the agency action and the modification to land, water, or air, but it explicitly states that "indirect" causation is sufficient. 50 C.F.R. § 402.02(d). The regulation thus eschews EPA's idea that the agency must be directly causing changes to the physical world for there to be "agency action."

*Third*, Supreme Court precedent on another EPA action under the CWA strongly indicates that EPA's argument is wrong. In *National Association of Home Builders v. Defenders of Wildlife*, the Supreme Court considered whether EPA's decision to delegate authority to issue CWA National Pollutant Discharge Elimination System ("NPDES") permits to the State of Arizona triggered the ESA's Section 7 consultation requirement. 551 U.S. at 653. Notably, EPA's decision to transfer permitting authority to a state does not itself authorize, fund, or directly "carry out" anything on the ground. *Id*. It does not, for example, authorize any pollution discharges, require the issuance of a discharge permit, or change permit conditions. *Id*. at 650. It only means that EPA will play a significantly reduced role in carrying out the NPDES pollution discharge permitting program in that state.

Nonetheless, the Supreme Court held that EPA's decision to transfer permitting authority was an "action authorized, funded, or carried out by a federal agency." *Id.* at 668. Dissenting on other grounds, Justice Stevens wrote that "[a] transfer of NPDES permitting authority . . . is *undoubtedly* one of those 'actions' that is 'authorized' or 'carried out' by a federal agency." *Id.* at 678 (emphasis added). To be sure, the majority in *Home Builders* ultimately held that the delegation decision was not sufficiently discretionary to trigger Section 7 consultation. *Id.* at 673. But, as EPA has pointed out, the question of discretion is distinct from the threshold question of "action," and EPA admits that its decision to revise its 304(a)

cadmium criteria was sufficiently discretionary. EPA Br. at 35. *Home Builders* thus rejects EPA's argument that "agency action" requires direct "conduct in the physical world." EPA Br. at 36.

**2. This Court's precedent strongly supports finding that EPA's 304(a) criteria is an "agency action."**

While it is correct that no federal appellate court has specifically addressed whether issuing nationwide water quality criteria under the CWA is an agency action that requires consultation under the ESA, this Court and others have squarely addressed similar fact patterns and found consultation to be required. The outcome should be the same here.

To make its argument, EPA extrapolates implied dicta from dissimilar fact patterns to craft an untenable rule that "agency actions" are limited to direct authorization, funding, and agency implementation projects which themselves affect the physical world—and everything else falls outside the ESA. EPA Br. at 44. EPA (again) protests too much. For example, EPA relies heavily on *Marbled Murrelet v. Babbitt*, 83 F.3d 1068 (9th Cir. 1996), in which the Court held there was no "agency action" when FWS provided non-binding advice in an ad hoc letter to two private logging companies on how to avoid violating the ESA's Section 9 prohibition on "take." But issuing statutorily mandated 304(a) criteria which have nationwide consequences, including action-forcing mechanisms for every state, is altogether

different than a one-off advice letter about a project that was not under the agency's purview.

The Court need not entertain EPA's far-reaching arguments that misapply the Court's prior decisions. The Court should instead rely on its own extensive precedent confirming analogous conduct to be "agency action" within the meaning of the ESA. For example, the Supreme Court recently denied certiorari of this Court's decision in *Environmental Defense Center v. Bureau of Ocean Energy Management*, which builds off of prior holdings that "programmatic documents constitute[] agency action [under the ESA] because they 'set forth criteria' that would influence future activities," even though they do not mandate or authorize any explicit activity. 36 F.4th 850, 884–85 (9th Cir. 2022), *cert denied*, 143 S. Ct. 2582 (2023). The agency action at issue in that case was Bureau of Ocean Energy Management's National Environmental Policy Act ("NEPA") review of "alternative options that would have imposed restrictions affecting the oil companies' subsequent applications" to use oil well stimulants. *Id.* The agency's resulting environmental analysis "did not establish binding criteria for well stimulation treatment use." *Id.* at 885. Instead, the agency chose not to regulate the use of well stimulants. *Id.*

The Court's precedent has long been consistent with the conclusions it reached in *Bureau of Ocean Energy Management*. For example, thirty years ago, the Court held that there could be "little doubt" that a plan "establishing resource and

land use policies" across a national forest is an agency action under the ESA. *Pac. Rivers Council*, 30 F.3d at 1055–56. In so doing, the court rejected the argument that consultation is not required for such plans because they "do not mandate any action and are 'merely' programmatic documents." *Id.*; *see also Cal. ex rel. Lockyer v. U.S. Dep't of Agric.*, 459 F. Supp. 2d 874, 911 (N.D. Cal. 2006), *aff'd*, 575 F.3d 999 (9th Cir. 2009) (noting that the Court "squarely rejected" the claim that programmatic planning documents do not require Section 7 consultation and holding that, even if a decision's effects "are viewed as indirect, they are at least reasonably likely to occur and therefore are subject to ESA review."). Further, in *Lane County Audubon Society v. Jamison*, the Court held that an agency's voluntary promulgation of a "Management Guidelines" document that "essentially sets forth the criteria for selection of land for logging" was "without a doubt" an affirmative agency action, despite that it did not directly authorize any on the ground activities (or, as EPA would say, despite the fact that it did not alter the "material world"). 958 F.2d 290, 291–94 (9th Cir. 1992). Thus, "the Ninth Circuit has undeniably interpreted ESA to require consultation on programmatic actions and rules, including consultation at the planning stage, not just the site-specific stage." *Citizens for Better Forestry v. U.S.*

*Dep't of Agric.*, 481 F. Supp. 2d 1059, 1095 (N.D. Cal. 2007) (citing *Pac. Rivers Council*, 30 F.3d at 1050).[10]

The Court has so held for good reasons. In *Conner v. Burford*, 848 F.2d 1441, 1453-58 (9th Cir. 1988), the Court required consultation on a lease program, noting the ESA requires an agency "to analyze the effect of the entire agency action," meaning comprehensive consultation cannot just be deferred to the project-specific stage. And in *Cottonwood Environmental Law Center v. U.S. Forest Service*, 789 F.3d 1075, 1082 (9th Cir. 2015), the Court explained that the analysis in "project-specific consultations" is not "comparable in scope and scale to consultation at the programmatic level," so it is not an adequate substitute.

The ESA's implementing regulations also call for consultation to begin "at the earliest possible time," and specifically contemplate consultation on an agency's "proposed program, plan, policy, or regulation providing a framework for future proposed actions." 50 C.F.R. §§ 402.14 (requirement for formal consultation), 402.02 (defining "programmatic actions"). Programs, plans, policies, and

---

[10] Other circuits agree. *See, e.g.*, *Growth Energy v. U.S. EPA*, 5 F.4th 1, 30 (D.C. Cir. 2021) (finding that, despite other unrelated contributing causes, EPA's renewable fuel standards "will likely continue to cause increased biofuel feedstock production, which in turn may harm listed species and critical habitat," triggering consultation); *Forest Guardians v. Forsgren*, 478 F.3d 1149,1154 (10th Cir. 2007) (expressing "little doubt" that "the act of approving, amending, or revising" a plan that merely provides a "framework for making later project decisions" constitutes "action" under Section 7 of the ESA).

"framework" regulations are all things that do not themselves alter the "material world," but under this Court's precedent and the Services' regulations, they are "agency actions" nonetheless. *See, e.g.*, *Conner*, 848 F.2d at 1453-58; *Cottonwood*, 789 F.3d at 1082.

Ignoring the import of this precedent, EPA argues that 304(a) criteria is different because it does not involve "conduct that alters the physical world." EPA Br. at 42. But 304(a) criteria alter the physical world even more so than environmental review or planning documents that "do not mandate any action." *Pac. Rivers Council*, 30 F.3d at 1055. For example, a forest planning document might set parameters on permissible logging areas, but it does not itself incentivize, authorize, or cause any logging to occur. And the environmental review in *Bureau of Ocean Energy Management* decided to set no criteria at all. 36 F.4th at 885. In contrast, the CWA and its implementing regulations require all states to have water quality criteria for cadmium, mandate that states consider any new 304(a) criteria every three years and provide strong incentives for every state to adopt those 304(a) criteria. 33 U.S.C. § 1313(c)(2)(b); 40 C.F.R. § 131.20; 80 Fed. Reg. 51020, 51028 (states and authorized tribes "must consider" revised 304(a) criteria). And again, EPA relies directly on its 304(a) criteria to set contaminated property cleanup requirements. 42 U.S.C. § 9621(d)(2)(A); 40 C.F.R. § 300.430(e)(5)(E). EPA also relies directly on its 304(a) criteria to support its national effluent limit guidelines

for entire industrial sectors. *See, e.g.*, U.S. EPA, *Benefit and Cost Analysis for Proposed Supplemental Effluent Limitations Guidelines and Standards for the Steam Electric Power Generating Point Source Category*, EPA-821-R-23-003, at 2-9–2-10 (Feb. 28, 2023).

Thus, EPA's revision of its 304(a) criteria is action forcing by law and not a mere "informal proffer of advice" in a context "where no federal authorization is required" that may bypass Section 7 consultation. *Karuk*, 681 F.3d at 1021 (citing *Marbled Murrelet*, 83 F.3d at 1074–75). Rather, "legal consequences will flow" from the agency's activity, so it is "not merely advisory" but rather is an agency action for ESA purposes. *Karuk*, 681 F.3d at 1023 (citation omitted).

#### 3. Abiding by the statute's plain text will not require EPA to consult over press releases or other absurd results.

Finally, the Court can easily dispense with EPA's argument that following the plain text and well-established case law on "agency action" will bring the sky crashing down. The ESA and the Administrative Procedure Act (which supplies certain standards for ESA suits over Section 7 violations) already contain safeguards that prevent the kinds of absurd results EPA proffers.

The ESA and its regulations set forth the procedural thresholds that agencies must assess to determine what consultations are needed. *See* 16 U.S.C. § 1536; 50 C.F.R. §§ 402.02, 402.14. The threshold "may affect"/"no effect" inquiry obviates the need for EPA to engage in formal consultation over any actions that have no

effect on protected wildlife. *Karuk Tribe*, 681 F.3d at 1027. The informal consultation process provides an off-ramp for actions that cross the "may affect" threshold, but do not rise to the level of take. 50 C.F.R. § 402.14. Where effects are insignificant, discountable, or beneficial, no formal consultations are required. *Id.* § 402.14(b); *see also* SER-127. And, where the action agency makes a valid, non-arbitrary "no effect" determination, it has not violated Section 7 at all. 50 C.F.R. § 402.14(b). But this is not such a case—indeed it is nowhere near the line. Among many other reasons discussed below, EPA itself acknowledged the need for consultation on nationwide water quality criteria in its 2001 MOA with the Services. *See* SER-197. Certainly, this case presents no occasion to rewrite Section 7.

Nor would affirming the district court's order mean that the Center could challenge intermediate steps during the water quality criteria setting process. EPA Br. at 46-47. Just as this Court's prior holdings in *Karuk Tribe* and *Conner v. Burford* did not allow ESA citizen suits at every internal step of land management planning or oil leasing reviews, nothing in this case will open up agency decision-making to mid-stream challenges.

If EPA's real concern is that it prefers the brevity of piecemeal, state-level consultation, there are answers for that too. The Services already opined that, after the first consultation on EPA's cyanide criteria, subsequent nationwide consultations

will be much more efficient. SER-5–6. EPA can find other efficiencies in the Services' regulations for programmatic consultation. 50 C.F.R. §§ 402.14, 402.02.

Moreover, EPA must comply with the ESA's broad consultation mandate, regardless of efficiency or preferences. Congress and the Supreme Court have made plain that the goal of the ESA is "to halt and reverse the trend toward species extinction, whatever the cost," because Congress intended for species in danger of extinction to be granted the "highest of priorities." *Tenn. Valley Auth.*, 437 U.S. at 184; 16 U.S.C. § 1536(a)(2). The structure of Section 7 further "reveals a conscious decision by Congress to give endangered species priority over the 'primary missions' of federal agencies." *Tenn. Valley Auth.*, 437 U.S. at 185. While Congress might be able to make such "fine utilitarian calculations" about when the mandates of Section 7 should be followed, it is not the province of the courts, *id.* at 187, nor the EPA to decide when consultations are most convenient. Specifically, for broad-scale federal actions that "may affect" listed species, the ESA requires both programmatic and project-specific review because that approach "provides the only way to avoid piecemeal destruction of species and habitat." *N. Plains Res. Council v. U.S. Army Corps of Eng'rs*, 454 F.Supp.3d 985, 990-94 (D. Mont. 2020); *see also Conner v. Burford*, 848 F. 2d at 1454 (holding it is "critical that ESA review occur early in the process to avoid piecemeal chipping away of habitat"). Indeed, that is precisely why NMFS stated that EPA's "piecemeal" approach to consultation on

water quality criteria "leads to an incomplete consideration of the effects of the action that is legally vulnerable." ER-261.

### B. EPA's 304(a) cadmium criteria "may affect" protected species, satisfying the "relatively low" threshold for consultation.

"[A]ctions that have *any* chance of affecting listed species or critical habitat—even if it is later determined that the actions are 'not likely' to do so—require at least some consultation under the ESA." *Karuk Tribe*, 681 F.3d at 1027 (citation omitted in original) (emphasis added). The bar for when federal agencies must consult with the Services ahead of planned or proposed actions is therefore "relatively low," "to allow Federal agencies to satisfy their duty to 'insure' that their actions do not jeopardize listed species or adversely modify critical habitat." *Id.* (citation omitted); 16 U.S.C. § 1536(a)(2). Only upon a determination that an action will have "no effect" on protected species or their habitats may an agency bypass Section 7 consultation. *Karuk Tribe*, 681 F.3d at 1027; *see also Growth Energy*, 5 F.4th at 30.

#### 1. EPA never made a "no effect" determination.

At the outset, EPA never made a "no effect" determination in the first instance, and it cannot, years after its 2016 304(a) criteria went into effect, pretend to have done so now. *See* ER-249; *NRDC v. EPA*, 31 F.4th at 1206 ("It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself."). The Center provided substantial comments in 2016 alerting EPA of its obligations under the ESA. ER-249–250; SER-44–48. NMFS did the

same. ER-259–261; SER-49–81. In response to these comments, EPA did not assert that revising 304(a) criteria had "no effect" on listed species nor did it claim to have made a "no effect" determination in satisfaction of its consultation obligations. *See* ER-249–250; ER-252. Instead, EPA merely responded that it would consult only on its later, state-level approvals of water quality standards. *Id.* This is a far cry from the explicit "no effect" determination required by the ESA. *See Am. Fuel & Petrochemical Mfrs. v. EPA*, 937 F.3d 559, 597-98 (D.C. Cir. 2019).

In *American Fuel*, the D.C. Circuit held that EPA's response to comments claiming that "any harm to threatened or endangered species or their critical habitat . . . could not be attributed with reasonable certainty to EPA's action," was not a 'no effect' determination." *Id.* To the contrary, the court held that EPA's statement amounted to an admission that EPA did not know if its action would affect species, which is inconsistent with a "no effect" finding. *Id*. at 598. EPA made a similarly equivocal but more damning admission here when it conceded that criteria do ultimately affect listed species, noting both transboundary concerns and the inevitable need to make criteria more stringent for some species. ER-249–250. Plainly, then, EPA failed to make a "no effect" finding. *See Am. Fuel*, 937 F.3d at 597-98.

### 2. The record shows that EPA's 304(a) cadmium criteria may affect protected species and designated habitat.

There is ample evidence in the record that EPA's action may affect, and indeed is already affecting, threatened and endangered species across the country. This is unsurprising given the basic nature of the action: (1) EPA increased its chronic freshwater cadmium criteria nearly threefold, which increased cadmium pollution under various regulatory regimes across the country; (2) cadmium is a toxic heavy metal that has adverse effects on aquatic species' growth, reproduction, immune and endocrine systems, development, and behavior; and (3) due to their life-spans and broad migratory range, threatened and endangered species including Atlantic, green, pallid, Gulf, and shortnose sturgeon, salmonids such as coho, sockeye, and Chinook salmon and steelhead trout, and green, leatherback, and loggerhead sea turtles, face special and complex risks from cadmium exposure. *See, e.g.*, ER-259–61; SER-59–61, 71–71, 44–48.

As a result of these likely adverse effects to threatened and endangered species and their critical habitats, NMFS explicitly criticized EPA's failure to engage in nationwide consultation over the 2016 304(a) cadmium criteria. ER-259–261. Section 7 consultation is needed at the nationwide level, NMFS confirmed, to "ensure that [state water quality standard] authorizations, taken together, do not jeopardize the continued existence of ESA-listed species or adversely modify their critical habitats." ER-261. The implication of NMFS's letter is that EPA's 304(a)

criteria may affect ESA-listed species, and nationwide consultation is needed to determine exactly what kinds of effects the criteria have on protected species and how to minimize or avoid harm.

Even EPA's myopic "piecemeal approach when considering implications of such guidelines for broadly ranging species" which, according to NMFS, "leads to an incomplete consideration of the effects of the action," *id.*, reveals that EPA's criteria "may affect" listed species. For example, even though it only analyzed a limited geographic area, NMFS's 2022 Biological Opinion found that using EPA's 2016 cadmium criteria in New Hampshire and Massachusetts was likely to adversely affect two species of sturgeon and may affect several species of sea turtles, whales, and their critical habitats. *See* SER-120, 141. Similarly, NMFS found that ESA-listed sea turtles may be affected by the use of EPA's 304(a) criteria in water quality standards in the Virgin Islands, and that EPA's 2016 cadmium criteria standards may affect and even adversely affect Atlantic and shortnose sturgeon in Georgia. *See* SER-99, 153, 156–57. EPA's own Biological Evaluation for North Carolina's proposed water quality standards further found that the 2016 chronic freshwater cadmium criteria may affect ESA-listed Atlantic and shortnose sturgeon. *See* SER-183. In addition, the 2001 0.25 μg/L chronic freshwater cadmium criterion, which was adopted by Oregon, was reported by NMFS to have sublethal effects on endangered and threatened species in the state. *See* ER-259. EPA's 2016 chronic

freshwater cadmium criteria is "nearly three-fold Oregon's criterion and would be expected to result in more severe effects." *Id*.

NMFS's repeated findings that EPA's 2016 cadmium criteria would affect listed species is "significant," as it is the agency "'primarily responsible for protecting endangered species'" because it has the "'appropriate expertise.'" *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 497 (9th Cir. 2011) (quoting *Sierra Club v. Marsh*, 816 F.2d 1376, 1388 (9th Cir. 1987)).

### 3. EPA's "no effect" argument relies on an impermissible reading of the ESA twice rejected by the D.C. Circuit Court of Appeals.

Even if EPA could make a legally cognizable post-hoc "no effect" argument now (it cannot), it would be arbitrary and capricious. *See, e.g.*, *Growth Energy*, 5 F.4th at 31-32 (rejecting EPA's "no effect" finding). At bottom, EPA advances an abstract, legalistic argument that its 304(a) criteria technically cannot affect species or their designated critical habitat because the chain of causation it too attenuated. EPA Br. at 57-60. This is a reprise of EPA's standing and "agency action" arguments and should be rejected for similar reasons.

The D.C. Circuit has twice rejected precisely the same logic EPA uses here in its attempt to evade Section 7 consultation. *Growth Energy,* 5 F.4th at 32; *Am. Fuel & Petrochemical Mfrs.*, 937 F.3d at 598. In both cases, petitioners challenged EPA's failure to consult over its annual renewable fuel production targets because those targets indirectly led to protected species habitat being converted to biofuel crops.

*See, e.g.*, *Am. Fuel & Petrochemical Mfrs.*, 937 F.3d at 591. Mirroring its arguments in this case, EPA contended that because its fuel targets "does not require, authorize, fund, or carry out the production of any specific biofuel or crop," it had no legally cognizable effect on listed species. *Growth Energy*, 5 F.4th at 30 (internal quotations omitted). Further, EPA asserted that the fuel targets would have no indirect effects because they would not influence the production of corn or soybeans for use as renewable fuel, and even if they did, impacts from such increased production "could not be attributed with reasonable certainty to" EPA's targets because of intervening market factors. *Id.* at 30-31. Notably, EPA's biofuel targets did not regulate crop growers at all. *See id.*

The D.C. Circuit rejected these arguments, holding, "[t]o the extent EPA questions the causal connection between the [targets] and specific land use changes, this alone does not excuse the failure to engage in formal consultation." *Id.* at 32. The court reiterated that the ESA regulations require action agencies like EPA to make an explicit finding that the proposed action will not adversely affect listed species or their habitat before Section 7 consultation can be avoided. *Id.* In addition, the court noted that the evidence in the record and EPA's own prior analysis contradicted EPA's "no effect" determination. *Id.* at 31-32. The court's *Growth Energy* holding builds out of its earlier *American Fuel & Petrochemical Manufacturers* decision, where the court likewise held that EPA's "inability to

'attribute' environmental harms 'with reasonable certainty'… is not the same as a finding that [EPA's action] 'will not affect' or 'is not likely to affect' listed species or critical habitat." 937 F.3d at 598. In both *Growth Energy* and *American Fuel*, the D.C. Circuit made clear that an agency action "may affect" listed species even if the effects occur at the end of a long chain of causation involving unregulated third parties making independent choices subject to market forces.

The Court should reject EPA's tired arguments here for these same reasons: nothing in the low threshold of "may affect" suggests the need for certainty about specific harms, and here the record provides ample evidence that EPA's water quality criteria "may affect" listed species. Furthermore, the chain of causation is neither attenuated nor subject to significant intervening forces. *See supra*, pages 11–14 and 29–32.

#### 4. Uncertainty about exactly where and when project level effects will occur does not excuse EPA from consulting at the earliest practicable time.

ESA regulations, this Court's precedent, and the D.C. Circuit's holdings in *Growth Energy* and *American Fuel* further confirm that consultation is required even if uncertainties exist about exactly how programmatic or landscape-wide agency actions will roll out. Indeed, the Services' joint regulations implementing the ESA call for consultation at the "earliest practicable time," including for programmatic

actions, which include a "proposed program, plan, policy, or regulation providing a framework for future proposed actions." 50 C.F.R. §§ 402.14, 402.02.

Accordingly, this Court has consistently rejected the argument that agencies only need to consult once a project reaches the site-specific or project-specific phase. *See, e.g.*, *Pac. Rivers Council*, 30 F.3d 1050; *Lane County Audubon Soc.*, 958 F.2d 290; *Citizens for Better Forestry*, 481 F. Supp. 2d 1059. Were the Court to ignore decades of settled law and accept EPA's argument, federal agencies could easily evade the ESA's consultation mandate for all of their large-scale actions. The ESA requires otherwise: agencies must consult at the nationwide level, so that the Biological Opinion can "analyze the effect of the *entire* agency action," and they must consult "early in the process to avoid piecemeal chipping away of habitat." *Conner*, 848 F.2d at 1453-54 (emphasis in original).

EPA's failure to grapple with these authorities or even acknowledge programmatic and nationwide consultation in its opening brief is a glaring omission. The Court should reject EPA's argument that its 304(a) cadmium criteria must not affect protected species only because EPA cannot predict exactly which states will adopt the 304(a) criteria. EPA Br. at 58-59. This Court has repeatedly held that approaching consultation the way EPA does—piecemeal, smaller-scale consultation only—is insufficient to protect listed species under the ESA.

### 5. EPA relies on unpersuasive non-binding authority.

EPA's "no effect" argument draws from disparate, inapposite, non-binding authorities. None are persuasive.

First, EPA cites to a legal memorandum from the Solicitor of the Interior (hereafter "the M-Opinion") in an attempt to explain why its issuance of 304(a) criteria does not mandate consultation. EPA Br. at 55. This guidance, however, is not in the record, nor is it applicable nor persuasive, and it cannot displace binding ESA regulations and Ninth Circuit precedent. The M-Opinion is bookended by clear statements that the memo's guidance is limited to instances where "the effect at issue is climate change in the form of increased temperatures." *See* Guidance on the Applicability of the Endangered Species Act's Consultation Requirements to Proposed Actions Involving the Emissions of Greenhouse Gases, M-37017 at 2, 7 (Oct. 3, 2008). Moreover, the M-Opinion is a sixteen-year-old non-binding guidance document from an office outside the relevant action agency and has never been cited by a court to aid in the interpretation of the "may affect" analysis. This is because the ESA's implementing regulations and Ninth Circuit caselaw are clear: "may affect" encompasses *all* potential effects to listed species and their habitats. *See NRDC v. EPA*, 38 F.4th at 53; 50 C.F.R. § 402.14(a).

Even if the Court were to extend the scope of the M-Opinion's "may affect" approach here, EPA's actions easily exceed the metrics discussed therein. For

decades, almost all states have adopted EPA's 304(a) criteria verbatim, and EPA's regulations are structured to ensure that continues to be true. SER-7–11, 244; 40 C.F.R. §§ 131.11(b), 131.20(a). Additionally, EPA relies directly on its 304(a) criteria to establish cleanup requirements for contaminated sites, to support national effluent limit guidelines for industrial sectors, and has proposed to use 304(a) criteria in promulgating water quality standards for over 250 Indian tribes. *See supra*, page 14; 88 Fed. Reg. 29496, 29499, 29506. And, of course, listed species are present nationwide, making it reasonably foreseeable that they would overlap with EPA's 304(a) cadmium criteria. *See, e.g.*, ER-284 (listing dozens of endangered and threatened species harmed by cadmium pollution).

Next, EPA cites amendments to the Services' regulations that post-dated its 2016 decision. EPA Br. at 56. But, as EPA admits, not only are these versions of the regulation inapplicable, neither one substantively changes the "may affect" analysis. EPA Br. at 55–56.[11]

[11] The Court must "look to the regulations in place at the time of the challenged decision." *Bureau of Ocean Energy Mgmt.*, 36 F.4th at 879 n.5. The Services also explained that the 2019 regulations were not intended to apply retroactively. *See* 83 Fed. Reg. 35178, 35179 ("Nothing in these proposed revisions to the regulations is intended to require that any previous consultations under section 7(a)(2) of the Act be reevaluated on the basis of the final rule at such time that the final rule becomes effective.").

Finally, to support its argument that the issuance of 304(a) criteria has no effect on endangered and threatened species, EPA cites two easily distinguishable cases. First, EPA relies on *Department of Transportation v. Public Citizen*, 541 U.S. 752 (2004), which concerns the National Environmental Policy Act ("NEPA"), not the ESA. In *Public Citizen*, the court found insufficient "but-for" causation to trigger NEPA because the action agency was bound by a statutory mandate that left it with no discretion to limit traffic from Mexico and the resulting environmental impacts. *Id*. at 767-68. But while "NEPA requires a reasonably close causal relationship between the environmental effect and the alleged cause," *Public Citizen*, 541 U.S. at 767 (internal quotations omitted), the ESA's mandate is much broader: "*[a]ny possible effect*, whether beneficial, benign, adverse, or of an undetermined character, triggers the [Section 7 consultation] requirement." *Karuk*, 681 F.3d at 1027 (citations omitted) (emphasis in original). EPA points to no supporting authority that suggests NEPA's "but-for" causation principle applies to an ESA claim.

EPA's reliance on the two-page, non-precedential memorandum opinion in *Center for Biological Diversity v. United States HUD*, 359 F. App'x 781 (9th Cir. 2009) is similarly misplaced. The action at issue in the underlying case was the provision of mortgage insurance and loan guarantees by various federal agencies to foster urban development. *See Ctr. for Biological Diversity v. U.S. Dep't of Housing & Urban Dev.*, 541 F. Supp. 2d 1091, 1094 (D. Ariz. 2008). Because the defendant

agencies had no discretionary control over the development process, and any effects were "too attenuated to affect the listed species," the district court held that the agencies' actions were not the legal cause of the environmental harm, and this Court affirmed. *Id*. at 1100-01; *CBD v. HUD*, 359 F. App'x at 783. Here, however, EPA's 304(a) criteria are specifically intended to affect how much toxic pollution aquatic species are exposed to. *See* 56 Fed. Reg. 58420, 58424. The connection between EPA's action and the environmental effects is not remote or attenuated; rather, as the district court aptly explained, "[t]hat chain of possibilities is not long. Its links fit snugly together—by design." ER-26.

In short, EPA authority for its argument that its 304(a) cadmium criteria have no effect on protected species and habitat is unpersuasive.

### C. The Services' long-held position and EPA's prior agreement to consult over its 304(a) criteria support consultation here.

Finally, the Services' longstanding position that EPA's 304(a) criteria ought to undergo nationwide consultation—a position that EPA previously agreed with—strongly supports the district court's decision. As the Services and EPA explained in their 2001 MOA, nationwide consultation would "ensure a consistent approach to evaluating the effects of pollutants on species and identifying measures that may be needed to better protect them. National consultations will also ensure better consideration of effects on species whose ranges cross State boundaries." SER-197. In 2008, the Services and EPA engaged in (but did not complete) national

consultation over EPA's cyanide criteria that illustrated the underlying problem: whereas EPA concluded that its criteria "was not likely to adversely affect listed species or designated critical habitat" whatsoever, SER-209, the Services found that same criteria would jeopardize the continued existence of over 200 threatened and endangered species. SER-211–213, 262. And in 2019, NMFS went so far as to call EPA's refusal to engage in any more nationwide consultations over 304(a) criteria "legally vulnerable," expressing serious concerns that EPA's piecemeal approach to consultation "leads to an incomplete consideration of the effects of the action," and that an "aggregate" approach is needed to ensure that EPA's criteria "do not jeopardize the continued existence of ESA listed species or adversely modify designated critical habitat." ER-261. Such "thorough, reasoned, and consistent guidance on this question provides additional persuasive evidence of the statute's probable, if not plain, meaning." *Gonzales & Gonzales*, 107 F.4th at 1085 (Johnstone, J. concurring).

The reverse is also true: the 2001 MOA, as well as EPA's pursuit of Section 7 consultation for its 304(a) cyanide criteria, underscore the arbitrary and capricious nature of EPA's refusal to consult over its cadmium criteria. *See, e.g., W. Watersheds Project*, 632 F.3d at 498 (holding agency's failure to consult arbitrary and capricious where the agency consulted on prior revision to same regulations). The fact that an agency initiated formal consultations when it took the same type of action in the

past, and those "prior consultations underscore[d] the need for programmatic consultation," led one district court to hold that the agency "remains well aware" that its action "required Section 7(a)(2) consultation." *N. Plains Res. Council*, 454 F. Supp. 3d at 994. That is all the more true here, where NMFS emphasized the need for consultation on the precise criteria at issue. *See* ER-259–61.

## CONCLUSION

For all of the foregoing reasons, the Court should affirm the district court's decision partially vacating EPA's cadmium criteria and remanding the criteria so EPA can obtain the expert wildlife agencies' opinion on how better to protect endangered and threatened species and the habitats on which they rely.

RESPECTFULLY SUBMITTED this 2nd day of December 2024.

s/ Claire E. Tonry
Claire E. Tonry
Smith & Lowney PLLC
2317 E. John St.
Seattle, WA 98112
Tel: (206) 860-2883, Fax: (206) 860-4187
E-mail: claire@smithandlowney.com

Hannah Connor
Center for Biological Diversity
1411 K Street NW, Suite 1300
Washington, DC 20005
Tel: (202) 681-1676
E-mail: hconnor@biologicaldiversity.org

*Attorneys for Plaintiff-Appellee Center for Biological Diversity*

# STATEMENT OF RELATED CASES

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)** 23-2946

The undersigned attorney or self-represented party states the following:

[X] I am unaware of any related cases currently pending in this court.

[ ] I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[ ] I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** /s/Claire Tonry **Date** December 2, 2024

## CERTIFICATE OF COMPLIANCE

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)** 23-2946

I am the attorney or self-represented party.

**This brief contains** 13,377 **words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

[ ] it is a joint brief submitted by separately represented parties;

[ ] a party or parties are filing a single brief in response to multiple briefs; or

[ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated ______________.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/Claire Tonry **Date** December 2, 2024

## ADDENDUM

Except for the following, all pertinent statutory and regulatory authorities are set out in the Appellants' previously filed addendum to their opening brief.

50 C.F.R. § 402.02 (2016)........................................................................A-2

50 C.F.R. § 402.13 (2016)........................................................................A-5

50 C.F.R. § 402.14 (2016)........................................................................A-6

# 2016 50 CFR 402.02

2016 Code of Federal Regulations Archive

***LEXISNEXIS' CODE OF FEDERAL REGULATIONS > TITLE 50 -- WILDLIFE AND FISHERIES > CHAPTER IV -- JOINT REGULATIONS (UNITED STATES FISH AND WILDLIFE SERVICE, DEPARTMENT OF THE INTERIOR AND NATIONAL MARINE FISHERIES SERVICE, NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION, DEPARTMENT OF COMMERCE); ENDANGERED SPECIES COMMITTEE REGULATIONS > SUBCHAPTER A > PART 402 -- INTERAGENCY COOPERATION -- ENDANGERED SPECIES ACT OF 1973, AS AMENDED > SUBPART A -- GENERAL***

## § 402.02 Definitions.

Act means the Endangered Species Act of 1973, as amended, 16 U.S.C. 1531 et seq.

Action means all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas. Examples include, but are not limited to:

**(a)** actions intended to conserve listed species or their habitat;

**(b)** the promulgation of regulations;

**(c)** the granting of licenses, contracts, leases, easements, rights-of-way, permits, or grants-in-aid; or

**(d)** actions directly or indirectly causing modifications to the land, water, or air.

Action area means all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action.

Applicant refers to any person, as defined in section 3(13) of the Act, who requires formal approval or authorization from a Federal agency as a prerequisite to conducting the action.

Biological assessment refers to the information prepared by or under the direction of the Federal agency concerning listed and proposed species and designated and proposed critical habitat that may be present in the action area and the evaluation potential effects of the action on such species and habitat.

Biological opinion is the document that states the opinion of the Service as to whether or not the Federal action is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat.

Conference is a process which involves informal discussions between a Federal agency and the Service under section 7(a)(4) of the Act regarding the impact of an action on proposed species or proposed critical habitat and recommendations to minimize or avoid the adverse effects.

Conservation recommendations are suggestions of the Service regarding discretionary measures to minimize or avoid adverse effects of a proposed action on listed species or critical habitat or regarding the development of information.

Critical habitat refers to an area designated as critical habitat listed in 50 CFR parts 17 or 226.

Cumulative effects are those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation.

Designated non-Federal representative refers to a person designated by the Federal agency as its representative to conduct informal consultation and/or to prepare any biological assessment.

Destruction or adverse modification means a direct or indirect alteration that appreciably diminishes the value of critical habitat for the conservation of a listed species. Such alterations may include, but are not limited to, those that alter the physical or biological features essential to the conservation of a species or that preclude or significantly delay development of such features.

Director refers to the Assistant Administrator for Fisheries for the National Oceanic and Atmospheric Administration, or his authorized representative; or the Fish and Wildlife Service regional director, or his authorized representative, for the region where the action would be carried out.

Early consultation is a process requested by a Federal agency on behalf of a prospective applicant under section 7(a)(3) of the Act.

Effects of the action refers to the direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action, that will be added to the environmental baseline. The environmental baseline includes the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process. Indirect effects are those that are caused by the proposed action and are later in time, but still are reasonably certain to occur. Interrelated actions are those that are part of a larger action and depend on the larger action for their justification. Interdependent actions are those that have no independent utility apart from the action under consideration.

Formal consultation is a process between the Service and the Federal agency that commences with the Federal agency's written request for consultation under section 7(a)(2) of the Act and concludes with the Service's issuance of the biological opinion under section 7(b)(3) of the Act.

Framework programmatic action means, for purposes of an incidental take statement, a Federal action that approves a framework for the development of future action(s) that are authorized, funded, or carried out at a later time, and any take of a listed species would not occur unless and until those future action(s) are authorized, funded, or carried out and subject to further section 7 consultation.

Incidental take refers to takings that result from, but are not the purpose of, carrying out an otherwise lawful activity conducted by the Federal agency or applicant.

Informal consultation is an optional process that includes all discussions, correspondence, etc., between the Service and the Federal agency or the designated non-Federal representative prior to formal consultation, if required.

Jeopardize the continued existence of means to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species.

Listed species means any species of fish, wildlife, or plant which has been determined to be endangered or threatened under section 4 of the Act. Listed species are found in 50 CFR 17.11-17.12.

Major construction activity is a construction project (or other undertaking having similar physical impacts) which is a major Federal action significantly affecting the quality of the human environment as referred to in the National Environmental Policy Act [NEPA, 42 U.S.C. 4332(2)(C)].

Mixed programmatic action means, for purposes of an incidental take statement, a Federal action that approves action(s) that will not be subject to further section 7 consultation, and also approves a framework for the development of future action(s) that are authorized, funded, or carried out at a later time and any take of a listed species would not occur unless and until those future action(s) are authorized, funded, or carried out and subject to further section 7 consultation.

Preliminary biological opinion refers to an opinion issued as a result of early consultation.

Proposed critical habitat means habitat proposed in the FEDERAL REGISTER to be designated or revised as critical habitat under section 4 of the Act for any listed or proposed species.

Proposed species means any species of fish, wildlife, or plant that is proposed in the FEDERAL REGISTER to be listed under section 4 of the Act.

Reasonable and prudent alternatives refer to alternative actions identified during formal consultation that can be implemented in a manner consistent with the intended purpose of the action, that can be implemented consistent with the scope of the Federal agency's legal authority and jurisdiction, that is economically and technologically feasible, and that the Director believes would avoid the likelihood of jeopardizing the continued existence of listed species or resulting in the destruction or adverse modification of critical habitat.

Reasonable and prudent measures refer to those actions the Director believes necessary or appropriate to minimize the impacts, i.e., amount or extent, of incidental take.

Recovery means improvement in the status of listed species to the point at which listing is no longer appropriate under the criteria set out in section 4(a)(1) of the Act.

Service means the U.S. Fish and Wildlife Service or the National Marine Fisheries Service, as appropriate.

## Statutory Authority

16 U.S.C. 1531 et seq.

## History

[51 FR 19957, June 3, 1986; 73 FR 76272, 76286, Dec. 16, 2008; 74 FR 20421, 20422, May 4, 2009; 80 FR 26832, 26844, May 11, 2015; 81 FR 7214, 7225, February 11, 2016]

LEXISNEXIS' CODE OF FEDERAL REGULATIONS
Copyright © 2024, by Matthew Bender & Company, a member of the LexisNexis Group. All rights reserved.

End of Document

# 2016 50 CFR 402.13

2016 Code of Federal Regulations Archive

***LEXISNEXIS' CODE OF FEDERAL REGULATIONS > TITLE 50 -- WILDLIFE AND FISHERIES > CHAPTER IV -- JOINT REGULATIONS (UNITED STATES FISH AND WILDLIFE SERVICE, DEPARTMENT OF THE INTERIOR AND NATIONAL MARINE FISHERIES SERVICE, NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION, DEPARTMENT OF COMMERCE); ENDANGERED SPECIES COMMITTEE REGULATIONS > SUBCHAPTER A > PART 402 -- INTERAGENCY COOPERATION -- ENDANGERED SPECIES ACT OF 1973, AS AMENDED > SUBPART B -- CONSULTATION PROCEDURES***

## § 402.13 Informal consultation.

**(a)** Informal consultation is an optional process that includes all discussions, correspondence, etc., between the Service and the Federal agency or the designated non-Federal representative, designed to assist the Federal agency in determining whether formal consultation or a conference is required. If during informal consultation it is determined by the Federal agency, with the written concurrence of the Service, that the action is not likely to adversely affect listed species or critical habitat, the consultation process is terminated, and no further action is necessary.

**(b)** During informal consultation, the Service may suggest modifications to the action that the Federal agency and any applicant could implement to avoid the likelihood of adverse effects to listed species or critical habitat.

## Statutory Authority

16 U.S.C. 1531 et seq.

## History

[51 FR 19957, June 3, 1986; 73 FR 76272, 76287, Dec. 16, 2008; 74 FR 20421, 20423, May 4, 2009]

LEXISNEXIS' CODE OF FEDERAL REGULATIONS
Copyright © 2024, by Matthew Bender & Company, a member of the LexisNexis Group. All rights reserved.

---

**End of Document**

# 2016 50 CFR 402.14

2016 Code of Federal Regulations Archive

***LEXISNEXIS' CODE OF FEDERAL REGULATIONS > TITLE 50 -- WILDLIFE AND FISHERIES > CHAPTER IV -- JOINT REGULATIONS (UNITED STATES FISH AND WILDLIFE SERVICE, DEPARTMENT OF THE INTERIOR AND NATIONAL MARINE FISHERIES SERVICE, NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION, DEPARTMENT OF COMMERCE); ENDANGERED SPECIES COMMITTEE REGULATIONS > SUBCHAPTER A > PART 402 -- INTERAGENCY COOPERATION -- ENDANGERED SPECIES ACT OF 1973, AS AMENDED > SUBPART B -- CONSULTATION PROCEDURES***

## § 402.14 Formal consultation.

**(a)** Requirement for formal consultation. Each Federal agency shall review its actions at the earliest possible time to determine whether any action may affect listed species or critical habitat. If such a determination is made, formal consultation is required, except as noted in paragraph (b) of this section. The Director may request a Federal agency to enter into consultation if he identifies any action of that agency that may affect listed species or critical habitat and for which there has been no consultation. When such a request is made, the Director shall forward to the Federal agency a written explanation of the basis for the request.

**(b) Exceptions.**

**(1)** A Federal agency need not initiate formal consultation if, as a result of the preparation of a biological assessment under § 402.12 or as a result of informal consultation with the Service under § 402.13, the Federal agency determines, with the written concurrence of the Director, that the proposed action is not likely to adversely affect any listed species or critical habitat.

**(2)** A Federal agency need not initiate formal consultation if a preliminary biological opinion, issued after early consultation under § 402.11, is confirmed as the final biological opinion.

**(c)** Initiation of formal consultation. A written request to initiate formal consultation shall be submitted to the Director and shall include:

**(1)** A description of the action to be considered;

**(2)** A description of the specific area that may be affected by the action;

**(3)** A description of any listed species or critical habitat that may be affected by the action;

**(4)** A description of the manner in which the action may affect any listed species or critical habitat and an analysis of any cumulative effects;

**(5)** Relevant reports, including any environmental impact statement, environmental assessment, or biological assessment prepared; and

**(6)** Any other relevant available information on the action, the affected listed species, or critical habitat.

Formal consultation shall not be initiated by the Federal agency until any required biological assessment has been completed and submitted to the Director in accordance with § 402.12. Any request for formal consultation may encompass, subject to the approval of the Director, a number of similar individual actions within a given geographical area or a segment of a comprehensive plan. This does not relieve the Federal agency of the requirements for considering the effects of the action as a whole.

**(d)** Responsibility to provide best scientific and commercial data available. The Federal agency requesting formal consultation shall provide the Service with the best scientific and commercial data available or which can be obtained during the consultation for an adequate review of the effects that an action may have upon listed species or critical habitat. This information may include the results of studies or surveys conducted by the Federal agency or the designated non-Federal representative. The Federal agency shall provide any applicant with the opportunity to submit information for consideration during the consultation.

**(e)** Duration and extension of formal consultation. Formal consultation concludes within 90 days after its initiation unless extended as provided below. If an applicant is not involved, the Service and the Federal agency may mutually agree to extend the consultation for a specific time period. If an applicant is involved, the Service and the Federal agency may mutually agree to extend the consultation provided that the Service submits to the applicant, before the close of the 90 days, a written statement setting forth:

**(1)** The reasons why a longer period is required,

**(2)** The information that is required to complete the consultation, and

**(3)** The estimated date on which the consultation will be completed.

A consultation involving an applicant cannot be extended for more than 60 days without the consent of the applicant. Within 45 days after concluding formal consultation, the Service shall deliver a biological opinion to the Federal agency and any applicant.

**(f)** Additional data. When the Service determines that additional data would provide a better information base from which to formulate a biological opinion, the Director may request an extension of formal consultation and request that the Federal agency obtain additional data to determine how or to what extent the action may affect listed species or critical habitat. If formal consultation is extended by mutual agreement according to § 402.14(e), the Federal agency shall obtain, to the extent practicable, that data which can be developed within the scope of the extension. The responsibility for conducting and funding any studies belongs to the Federal agency and the applicant, not the Service. The Service's request for additional data is not to be construed as the Service's opinion that the Federal agency has failed to satisfy the information standard of section 7(a)(2) of the Act. If no extension of formal consultation is agreed to, the Director will issue a biological opinion using the best scientific and commercial data available.

**(g)** Service responsibilities. Service responsibilities during formal consultation are as follows:

**(1)** Review all relevant information provided by the Federal agency or otherwise available. Such review may include an on-site inspection of the action area with representatives of the Federal agency and the applicant.

**(2)** Evaluate the current status of the listed species or critical habitat.

**(3)** Evaluate the effects of the action and cumulative effects on the listed species or critical habitat.

**(4)** Formulate its biological opinion as to whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat.

**(5)** Discuss with the Federal agency and any applicant the Service's review and evaluation conducted under paragraphs (g)(1) through (3) of this section, the basis for any finding in the biological opinion, and the availability of reasonable and prudent alternatives (if a jeopardy opinion is to be issued) that the agency and the applicant can take to avoid violation of section 7(a)(2). The Service will utilize the expertise of the Federal agency and any applicant in identifying these alternatives. If requested, the Service shall make available to the Federal agency the draft biological opinion for the purpose of analyzing the reasonable and prudent alternatives. The 45-day period in which the biological opinion must be delivered will not be suspended unless the Federal agency secures the written consent of the applicant to an extension to a specific date. The applicant may request a copy of the draft opinion from the Federal agency. All comments on the draft biological opinion must be submitted to the Service through the Federal agency, although the applicant may send a copy of its comments directly to the Service. The Service will not issue its biological opinion prior to the 45-day or extended deadline while the draft is under review by the Federal agency. However, if the Federal agency submits comments to the Service regarding the draft biological opinion within 10 days of the deadline for issuing the opinion, the Service is entitled to an automatic 10-day extension on the deadline.

**(6)** Formulate discretionary conservation recommendations, if any, which will assist the Federal agency in reducing or eliminating the impacts that its proposed action may have on listed species or critical habitat.

**(7)** Formulate a statement concerning incidental take, if such take is reasonably certain to occur.

**(8)** In formulating its biological opinion, any reasonable and prudent alternatives, and any reasonable and prudent measures, the Service will use the best scientific and commercial data available and will give appropriate consideration to any beneficial actions taken by the Federal agency or applicant, including any actions taken prior to the initiation of consultation.

**(h)** Biological opinions. The biological opinion shall include:

**(1)** A summary of the information on which the opinion is based;

**(2)** A detailed discussion of the effects of the action on listed species or critical habitat; and

**(3)** The Service's opinion on whether the action is likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat (a "jeopardy biological opinion"); or, the action is not likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat (a "no jeopardy" biological opinion). A "jeopardy" biological opinion shall include reasonable and prudent alternatives, if any. If the Service is unable to develop such alternatives, it will indicate that to the best of its knowledge there are no reasonable and prudent alternatives.

**(i)** Incidental take. (1) In those cases where the Service concludes that an action (or the implementation of any reasonable and prudent alternatives) and the resultant incidental take of listed species will not violate section 7(a)(2), and, in the case of marine mammals, where the taking is authorized pursuant to section 101(a)(5) of the Marine Mammal Protection Act of 1972, the Service will provide with the biological opinion a statement concerning incidental take that:

**(i)** Specifies the impact, i.e., the amount or extent, of such incidental taking on the species (A surrogate (e.g., similarly affected species or habitat or ecological conditions) may be used to express the amount or extent of anticipated take provided that the biological opinion or incidental take statement: Describes the causal link between the surrogate and take of the listed species, explains why it is not practical to express the amount or extent of anticipated take or to monitor take-related impacts in terms of individuals of the listed species, and sets a clear standard for determining when the level of anticipated take has been exceeded.);

**(ii)** Specifies those reasonable and prudent measures that the Director considers necessary or appropriate to minimize such impact;

**(iii)** In the case of marine mammals, specifies those measures that are necessary to comply with section 101(a)(5) of the Marine Mammal Protection Act of 1972 and applicable regulations with regard to such taking;

**(iv)** Sets forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency or any applicant to implement the measures specified under paragraphs (i)(1)(ii) and (i)(1)(iii) of this section; and

**(v)** Specifies the procedures to be used to handle or dispose of any individuals of a species actually taken.

**(2)** Reasonable and prudent measures, along with the terms and conditions that implement them, cannot alter the basic design, location, scope, duration, or timing of the action and may involve only minor changes.

**(3)** In order to monitor the impacts of incidental take, the Federal agency or any applicant must report the progress of the action and its impact on the species to the Service as specified in the incidental take statement. The reporting requirements will be established in accordance with 50 CFR 13.45 and 18.27 for FWS and 50 CFR 216.105 and 222.301(h) for NMFS.

**(4)** If during the course of the action the amount or extent of incidental taking, as specified under paragraph (i)(1)(i) of this Section, is exceeded, the Federal agency must reinitiate consultation immediately.

**(5)** Any taking which is subject to a statement as specified in paragraph (i)(1) of this section and which is in compliance with the terms and conditions of that statement is not a prohibited taking under the Act, and no other authorization or permit under the Act is required.

**(6)** For a framework programmatic action, an incidental take statement is not required at the programmatic level; any incidental take resulting from any action subsequently authorized, funded, or carried out under the program will be addressed in subsequent section 7 consultation, as appropriate. For a mixed programmatic action, an incidental take

statement is required at the programmatic level only for those program actions that are reasonably certain to cause take and are not subject to further section 7 consultation.

**(j)** Conservation recommendations. The Service may provide with the biological opinion a statement containing discretionary conservation recommendations. Conservation recommendations are advisory and are not intended to carry any binding legal force.

**(k)** Incremental steps. When the action is authorized by a statute that allows the agency to take incremental steps toward the completion of the action, the Service shall, if requested by the Federal agency, issue a biological opinion on the incremental step being considered, including its views on the entire action. Upon the issuance of such a biological opinion, the Federal agency may proceed with or authorize the incremental steps of the action if:

**(1)** The biological opinion does not conclude that the incremental step would violate section 7(a)(2);

**(2)** The Federal agency continues consultation with respect to the entire action and obtains biological opinions, as required, for each incremental step;

**(3)** The Federal agency fulfills its continuing obligation to obtain sufficient data upon which to base the final biological opinion on the entire action;

**(4)** The incremental step does not violate section 7(d) of the Act concerning irreversible or irretrievable commitment of resources; and

**(5)** There is a reasonable likelihood that the entire action will not violate section 7(a)(2) of the Act.

**(l)** **Termination of consultation.**

**(1)** Formal consultation is terminated with the issuance of the biological opinion.

**(2)** If during any stage of consultation a Federal agency determines that its proposed action is not likely to occur, the consultation may be terminated by written notice to the Service.

**(3)** If during any stage of consultation a Federal agency determines, with the concurrence of the Director, that its proposed action is not likely to adversely affect any listed species or critical habitat, the consultation is terminated.

## Statutory Authority

16 U.S.C. 1531 et seq.

## History

[51 FR 19957, June 3, 1986, as amended at 54 FR 40350, Sept. 29, 1989; 73 FR 76272, 76287, Dec. 16, 2008; 74 FR 20421, 20423, May 4, 2009; 80 FR 26832, 26844, May 11, 2015]

LEXISNEXIS' CODE OF FEDERAL REGULATIONS
Copyright © 2024, by Matthew Bender & Company, a member of the LexisNexis Group. All rights reserved.

End of Document