No. 23-2946

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

CENTER FOR BIOLOGICAL DIVERSITY,

*Plaintiff-Appellee,*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.*,

*Defendants-Appellants.*

On Appeal from the United States District Court for the District of Arizona
No. 4:22-cv-138
Hon. John Hinderaker

**APPELLEE CENTER FOR BIOLOGICAL DIVERSITY'S
OPPOSITION TO PETITION FOR REHEARING**

Claire E. Tonry
Smith & Lowney PLLC
2317 E. John Street
Seattle, Washington 98112
(206) 860-2883
claire@smithandlowney.com

Hannah Connor
Center for Biological Diversity
1411 K Street NW, Suite 1300
Washington, DC 20005
(202) 641-6176
hconnor@biologicaldiversity.org

*Attorneys for Plaintiff-Appellee
Center for Biological Diversity*

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................i

TABLE OF AUTHORITIES............................................................ ii

INTRODUCTION ....................................................................1

BACKGROUND ......................................................................3

ARGUMENT .........................................................................5

   I.  The Majority's Standing Decision Is Consistent With Supreme Court and Circuit Precedent. ..............................................................5

     A.  The Majority did not improperly relax the test for causation. ..........................7

     B.  The Majority did not "misread" Supreme Court precedent. ...........................8

     C.  EPA's novel and confused redressability arguments are no basis for rehearing…..............................................................11

     D.  Industry Amici reinforce the Majority's standing decision. ...........................14

  II.  The Decision Does Not Implicate Any Conflict on the Triggers for ESA Consultation. ...........................................................15

  III. The Decision Is Specific to the CWA's 304(a) Regulatory Regime and Does Not Involve Questions of Exceptional Importance. ................................17

CONCLUSION .......................................................................19

CERTIFICATE OF COMPLIANCE ......................................................20

i

## TABLE OF AUTHORITIES

### Cases

*Bennett v. Spear*, 520 U.S. 154 (1997)......................................................................10

*Block v. Meese*, 793 F.2d 1303 (D.C. Cir. 1986) (Scalia, J.) .................................12

*California ex rel. Lockyer v. USDA*, 575 F.3d 999 (9th Cir. 2009) .......................19

*Citizens for Better Forestry v. USDA*, 341 F.3d 961 (9th Cir. 2003)......................6

*Ctr. for Biological Diversity & Ctr. for Food Safety*, 53 F.4th 665 (D.C. Cir. 2022) ................................................................................................................................20

*Dep't of Commerce v. New York*, 588 U.S. 752 (2019) ....................................8, 12

*Department of Commerce v. New York*, 588 U.S. 752 (2019) ............................9, 11

*Diamond Alternative Energy v. EPA,* 606 U.S. 100 (2025)............................passim

*FDA v. All. for Hippocratic Med.*, 602 U.S. 367 (2024)...................................7, 12

*Florida Audubon Soc'y v. Bentsen*, 94 F.3d 658 (D.C. Cir. 1996) ..........................6

*Friends of Santa Clara River v. U.S. Army Corps of Eng'rs*, 887 F.3d 906 (9th Cir. 2018) .................................................................................................................19

*Growth Energy v. EPA*, 5 F.4th 1 (D.C. Cir. 2021) ...............................................21

*Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006 (9th Cir. 2012).........17, 19

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,* 572 U.S. 118 (2014)........12

*Marbled Murrelet v. Babbitt*, 83 F.3d 1068 (9th Cir. 1996) ..................................17

*Migrant Clinicians Network v. EPA,* 88 F.4th 830 (9th Cir. 2023)........................21

*National Association of Home Builders v. Defenders of Wildlife,* 551 U.S. 644 (2007) ................................................................................................................18

*New Jersey v. EPA,* 989 F.3d 1038 (D.C. Cir. 2021).................................................8

*Summers v. Earth Island,* 555 U.S. 488 (2009)........................................................13

*United States v. Mageno*, 786 F.3d 768 (9th Cir. 2015)...........................................13

*Watson v. Republican Nat'l Comm.,* No. 24-1260, 2026 WL 1855462 (U.S. June 29, 2026) .............................................................................................................21

*WildEarth Guardians v. U.S. Forest Serv.*, 70 F.4th 1212 (9th Cir. 2023)...........7, 8

**Statutes**

16 U.S.C. § 1536(a)(2) ......................................................................................15, 18

33 U.S.C. § 1313(c).....................................................................................1, 3, 5, 16

33 U.S.C. § 1314(a)...........................................................................................2, 3, 20

38 Maine Rev. Stat. 420(2.A).....................................................................................4

**Other Authorities**

56 Fed. Reg. 58420......................................................................................................1

80 Fed. Reg. 51020......................................................................................................4

EPA, *National Recommended Water Quality Criteria*, epa.gov/wqc/national-recommended-water-quality-criteria-organoleptic-effects...................................14

FWQC, Comments on Copper Criteria (Sept. 27, 2016) ........................................17

FWQC, Comments on Human Health Criteria (Aug. 13, 2014)............................17

Minn. R. 7050.0218(4)(C)..........................................................................................4

N.M. Admin. Code 20.6.4.13.F(3) ........................................................................... 4

**Regulations**

40 C.F.R. § 131.5 .................................................................................................2, 16

40 C.F.R. § 131.11 ...........................................................................................1, 3, 4

50 C.F.R. § 402.02 ...................................................................................................18

50 C.F.R. § 402.14 ......................................................................................19

## INTRODUCTION

This case is about EPA's refusal to engage in Endangered Species Act ("ESA") consultation with the expert federal wildlife agencies ("Services") before weakening its Clean Water Act ("CWA") Section 304(a) nationwide water quality criteria for cadmium, a heavy metal toxic to wildlife. EPA's 2016 304(a) cadmium criteria were adopted verbatim by most States within just a few years, including numerous States where the Center for Biological Diversity's ("Center") members study and enjoy endangered species in specific watersheds affected by specific industrial sources of cadmium pollution. SER-7-11; ER-32–95. This is consistent with how 304(a) criteria have played out for decades, which is exactly how Congress designed the law. *See* SER-7–11; 33 U.S.C. § 1313(c) (2); 40 C.F.R. §§ 131.11, 131.20; 56 Fed. Reg. 58420, 58421-24 (explaining intent).

The Center is not alone in recognizing the need for nationwide ESA consultation on 304(a) criteria. The Services — the expert agencies on ESA implementation — secured EPA's agreement to consult in 2001. SER-187–202. When EPA failed to follow through for cadmium, the National Marine Fisheries Service ("NMFS") wrote that EPA's piecemeal, state-by-state approach to consultation "leads to an incomplete consideration of the effects of the action" that is "legally vulnerable," because an "aggregate" approach is needed to ensure that EPA's criteria "do not jeopardize the continued existence of ESA-listed species or

1

adversely modify designated critical habitat." ER-260–261. NMFS was especially concerned for long-lived species that migrate across many State borders, like sturgeon and sea turtles. *Id.* However, EPA disregarded the Services, appealed the district court's thorough summary judgment decision in the Center's favor, and now seeks rehearing of the Majority's affirming opinion.

EPA does not meet the criteria for rehearing. It does not identify any genuine intra- or inter-circuit conflicts, only cases that came out a different way based on different facts. Nor did the Majority "misread" recent Supreme Court precedent, as EPA claims. The Majority applied well-established legal standards to the particular legal regime at hand and the facts in the record to conclude that implementation of EPA's 304(a) cadmium criteria is sufficiently traceable to EPA's promulgation of those criteria to support Article III standing, and sufficiently impactful to protected species to trigger ESA consultation. This conclusion naturally follows from the legal requirements that EPA base 304(a) criteria on the "latest scientific knowledge" and that States adopt criteria based on "sound scientific rationale," *as determined by EPA and subject to EPA's approval*. 33 U.S.C. § 1314(a)(1); 40 C.F.R. § 131.5(a)(2). The through-line of best-science-as-determined-by-EPA dispels any arguments about speculation or attenuation and readily satisfies the controlling standards for standing and ESA consultation.

2

As for EPA's policy arguments about the purported burden of complying with the ESA's requirement to consult over its nationwide criteria, EPA ignores that it regularly engages in nationwide ESA consultation for other actions with broad impacts, such as registering pesticides. That EPA prefers piecemeal consultations at a later stage is no excuse for ignoring the ESA and the CWA, both of which direct EPA to consult with appropriate federal agencies before issuing 304(a) criteria.

## BACKGROUND

EPA's Petition omits crucial facts and law that support the Majority's decision. The process of setting and implementing water quality criteria begins and ends with EPA, is explicitly designed to incentivize States to adopt EPA's 304(a) criteria, and has that result the vast majority of the time.

To begin with, Congress directed EPA to update 304(a) criteria to "reflect[] the latest scientific knowledge" following formal notice and comment and "consultation with appropriate Federal . . . agencies." 33 U.S.C. § 1314(a). Every "triennial review," States are required to consider adopting any revised 304(a) criteria. *Id.* § 1313(c)(1); 40 C.F.R. §§ 131.11, 131.20. EPA must approve any State criteria before they take legal effect under the CWA. 33 U.S.C. § 1313(c) (3). To earn EPA's approval of non-304(a) criteria, States must use "scientifically defensible methods," and undergo an intensive review process to convince EPA that different criteria are appropriate. 40 C.F.R. §§ 131.11(b), 131.20; 80 Fed. Reg.

3

51020, 51028 (states must explain any decisions "to not incorporate the latest science").

Several State laws further mandate adoption of EPA's 304(a) criteria or add hurdles to deter deviations from EPA's criteria. *See, e.g.*, 38 Maine Rev. Stat. 420(2.A) (requiring state to adopt EPA's 304(a) criteria); N.M. Admin. Code 20.6.4.13.F(3) (EPA's 304(a) criteria automatically apply if state has not adopted its own standards); Minn. R. 7050.0218(4)(C) (establishing presumption that 304(a) criteria will be adopted and imposing notice and hearing requirements before different criteria may be used).

Unsurprisingly, States rarely depart from EPA's 304(a) criteria. Rather, as forty-plus years of experience illustrate, the significant time and resources required to develop and defend alternative criteria causes "the vast majority of states" to use EPA's 304(a) criteria. SER-244; Op. 24. With very few exceptions, none of which are relevant here, EPA approves States' use of current 304(a) criteria. *See id.*; SER-7–11; ECF No. 37 at 1 ("EPA has not disapproved any" State's use of EPA's 2016 cadmium criteria).[1]

Finally, if EPA determines that a State's proposed criteria are inconsistent with the CWA (i.e., not scientifically defensible and protective), or that its

---

[1] EPA only rejected Oregon's proposal to use outdated 2001 cadmium 304(a) criteria based on EPA's imminent 2016 criteria updates. *See* Op. 15, 23.

4

previously approved criteria are outdated, EPA *must* promulgate criteria for that State. 33 U.S.C. § 1313(c) (4). And "[e]very time EPA has directly promulgated cadmium criteria for a State, it has used its own 304(a) [criteria]." Op. 14-15.

The historic factual patterns and strong legal incentives played out for EPA's 2016 cadmium criteria just as they have for decades. By the time the Center filed suit challenging EPA's failure to engage in any ESA consultation on its weakening of the cadmium criteria, 29 states, territories, and tribal jurisdictions already had EPA's 2016 cadmium criteria in place. SER-7–11. This includes Oregon, where EPA directly instituted the criteria. *Id.*

## ARGUMENT

Rehearing en banc "is not favored" and "ordinarily will be allowed only if" a petitioner demonstrates it "is necessary to secure or maintain uniformity of the court's decisions," a conflict with Supreme Court or other circuit precedent, or "the proceeding involves one or more questions of exceptional importance." Fed. R. App. P. 40(b)-(c). To justify panel rehearing, EPA must identify "with particularity" points of law or facts that the Court "overlooked or misapprehended." *Id*. EPA's Petition satisfies none of these standards.

**I.     The Majority's Standing Decision Is Consistent With Supreme Court and Circuit Precedent.**

Despite the sweeping rhetoric of its Petition, EPA's disagreement over Article III standing is ultimately quite narrow. EPA has never disputed the Center has

suffered concrete and particularized injuries in fact. Indeed, undisputed testimony proves the Center's members use specific water bodies nearby and downstream of specific CWA-regulated discharges of cadmium pollution in jurisdictions where EPA approved, directly promulgated, and otherwise used its 2016 304(a) cadmium criteria for regulatory purposes, such as setting discharge limits and cleanup plan standards. ER-32–95. And, because geographically specific, extant injury in fact is undisputed, this case does not even implicate the asserted circuit split EPA invokes based on one 20-year-old case. *See* Pet. 5 (citing *Florida Audubon Soc'y v. Bentsen*, 94 F.3d 658, 664-68 (D.C. Cir. 1996); *Citizens for Better Forestry v. USDA*, 341 F.3d 961, 974 (9th Cir. 2003) (noting tension between Ninth Circuit precedent and *Florida Audubon* over the level of geographic specificity required for standing in a NEPA challenge).

EPA also recognizes the connection between injuries to the Center's "identified interests" and States that "adopted Standards reflecting" EPA's 304(a) cadmium criteria. Pet. 17. EPA even accepts responsibility, arguing that "those injuries are traceable" and "attributable" to *EPA's* approval of States' proposals to use *EPA's* 304(a) criteria. *Id.* at 7, 9. Thus, EPA's disagreement is limited to its argument that States are such independent, unpredictable decisionmakers they sever the causal chain that both begins and ends with EPA. As explained below, that is a

6

"heavily fact-dependent" question that the Majority correctly analyzed using well-established precedent. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 384 (2024).

**A. The Majority did not improperly relax the test for causation.**

EPA and the Dissent agree, "the causation and redressability requirements are 'relaxed' for procedural claims only in the sense that a plaintiff 'need not establish the likelihood that the agency would render a different decision after going through the proper procedural steps.'" Pet. 6 (quoting, e.g., *WildEarth Guardians v. U.S. Forest Serv.*, 70 F.4th 1212, 1216 (9th Cir. 2023)). Here, the Majority applied this relaxed standard only to that extent — i.e., "whether consultation would result in EPA's publishing different recommendations" — as EPA agrees is appropriate. Op. 20-21; Pet. 6.

As to the reactions of third parties, which is where EPA takes issue, the Majority did not, as EPA asserts, apply a relaxed standard. Instead, the Majority used the precise standard for which EPA argues, that of *WildEarth Guardians*. Op. 21-22 (quoting *WildEarth Guardians* at 1217 for plaintiff's "burden . . . to adduce facts showing that [third party] choices have been or will be made"). Because the Majority did not relax the standard for third party reactions, there is also no conflict with D.C. Circuit precedent. *See* Pet. 7 (citing D.C. Circuit cases declining to relax third party aspects of causation). If anything, the Majority's analysis is stricter than the D.C. Circuit's "well-established standing precedent" holding that "it suffices to point to

third party conduct that is voluntary but reasonably predictable." *New Jersey v. EPA,* 989 F.3d 1038, 1049 (D.C. Cir. 2021) (quotations omitted) (citing, e.g., *Dep't of Commerce v. New York*, 588 U.S. 752, 768 (2019) ("*DOC*")).

### B. The Majority did not "misread" Supreme Court precedent.

Contrary to EPA's argument that the Majority "misreads" *Diamond Alternative Energy v. EPA,* 606 U.S. 100 (2025), and *Department of Commerce v. New York*, 588 U.S. 752 (2019), Pet. 12, the Majority faithfully applied their legal standards to conclude that States' adoption of EPA's 304(a) cadmium criteria (and EPA's approval thereof) is neither speculative *nor* attenuated. Specifically, the Majority found "particularly compelling evidence of traceability" that shows EPA's 304(a) criteria are a "powerful," often "determinative," and "highly 'predictable'" regulatory mechanism, in a scheme where EPA is "an integral participant" and State behavior is "not unfettered, but controlled and certainly predicted by EPA[]," all of which "easily satisfies this [C]ourt and the Supreme Court's" Article III standing tests. Op. 24-28.

EPA tries to distinguish *Diamond Alternative Energy* because it involved a regulation that directly mandated electric vehicle quotas for third party automakers, but the salient holding (on which the Majority relied here) turned on the degree and type of evidence needed to show that the regulation would adversely affect fuel producers. Pet. 12; Op. 22, 25 (citing *Diamond*, 606 U.S. at 112, 117-18). The

8

Supreme Court held that, despite evidence that independent market forces sometimes nullified the effect of the regulation, fuel producers could rely on commonsense inferences that the regulation would have its intended effect and need not produce ironclad expert evidence to prove standing. *Diamond*, 606 U.S. at 117-18. The panel Majority here correctly quotes *Diamond's* legal standard for causation and redressability — "likely (not certainly, but likely)" — and applies *Diamond's* holding that historical practice is powerful evidence that the standard is met here. Op. 22, 25.

Furthermore, well-established Supreme Court precedent rejects EPA's notion that only fully binding regulations can support standing. For example, in the ESA consultation process, the Services issue biological opinions that serve "an 'advisory function'" that the "action agency is technically free to disregard," yet the Supreme Court has held that private parties have standing to challenge biological opinions because of their coercive effect on action agencies. *Bennett v. Spear*, 520 U.S. 154, 168-70 (1997). And, much like the 304(a) criteria at issue here, that "powerful coercive effect" stems largely from the requirement that an "agency that chooses to deviate from the recommendations contained in a biological opinion bears the burden of 'articulating in its administrative record its reasons for disagreeing,'" something "agencies very rarely choose." *Id.* The Majority's reliance on these same factors is therefore fully consistent with Supreme Court precedent. Op. 22-26.

9

EPA's attempt to distinguish *DOC v. New York* fares even worse because all of the factual distinctions make for stronger standing here. Plaintiffs in *DOC* argued that, if the Census included a citizenship question, non-citizens would violate their legal duty to respond out of fear that the Government would violate its legal duty of confidentiality, leading to their deportation. 588 U.S. at 768. Despite the inference of illegality and lack of direct causation evidence, and largely based on historic evidence of lower response rates when the Census includes a citizenship question, the Supreme Court held that plaintiffs' theory of standing was based on "the predictable effect of Government action on the decisions of third parties," not mere speculation. *Id.* Here, the Center offers stronger historic evidence of States adopting 304(a) criteria and record evidence explaining that pattern, all of which is fully consistent with the CWA's regulatory regime and intent. Unlike in *DOC*, no one has to break the law for the Center to have standing, they just have to keep following the law — a commonsense inference if there ever was one.

*DOC* also squarely rejects EPA's suggestion that Article III requires government action to be the "legal cause" of third parties' "downstream decisions." Pet. 13. *DOC* holds that "Article III 'requires no more than *de facto* causality.'" *DOC* at 768 (quoting *Block v. Meese*, 793 F.2d 1303, 1309 (D.C. Cir. 1986) (Scalia, J.)); *accord Lexmark Int'l, Inc. v. Static Control Components, Inc.,* 572 U.S. 118, 134 n.6 (2014) ("Proximate causation is not a requirement of Article III standing, which

10

requires only that the plaintiff's injury be fairly traceable to the defendant's conduct.").

In short, the panel Majority's correct application of Supreme Court precedent to the particular factual record affords no basis for rehearing.

### C. EPA's novel and confused redressability arguments are no basis for rehearing.

The Majority properly found redressability based on the same facts that support causation. Op. 29. The Majority cites *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. at 383, and applies its common standard for causation and redressability when the "effects of government action or judicial relief on third parties" is at issue. Op. 22-26. While redressability may not always follow from causation, it often does, and, most importantly, *it does so here*. In any event, EPA's redressability arguments confuse the law and ignore the facts, providing no basis for rehearing.

EPA's main argument confuses the standard for geographically specific injury in fact with the standard for redressability. Pet. 14-16. The differences in the two tests nullify EPA's argument. Injury in fact must be actual or imminent, concrete, and particularized; a "probabilistic" likelihood of injury to some unnamed member of an organization is generally not enough. *Summers v. Earth Island,* 555 U.S. 488, 498-99 (2009) (holding that "naming the affected members has never been dispensed with in light of statistical probabilities," with some noted exceptions). That is not at

11

issue here because the Center indisputably demonstrated injury in fact to specific members in numerous specific States and habitats. *Supra* 5-6. EPA did not argue otherwise, *see* ECF No. 31 at 14, and this Court does not "consider issues that a party raises for the first time in a petition for rehearing." *United States v. Mageno*, 786 F.3d 768, 775 (9th Cir. 2015). Besides, EPA's Petition concedes the geographic specificity issue when it acknowledges that "States where [the Center] has identified interests have now adopted" EPA's 2016 304(a) cadmium criteria. Pet. 17.

In contrast, redressability *is* "probabilistic" in that it need only be "likely (not certainly, but likely)," that a judicial remedy will reduce the plaintiff's injury to some extent. *Diamond*, 606 U.S. at 118, 121 (rejecting a "heightened 'proof of redressability' requirement"). The Majority identified multiple lines of evidence supporting this likelihood, including States' and EPA's historical practice and State and federal laws and regulations requiring and incentivizing States to adopt 304(a) criteria. Op. 23-28. EPA cannot overcome this record or the commonsense inferences that flow from a regulatory regime designed (and proven) to get States to adopt EPA's criteria merely by pointing to a few isolated exceptions. *Diamond*, 606 U.S. at 123-24 (finding auto industry's response sufficiently likely despite evidence that seven automakers would act differently). Citing the Dissent, EPA alludes to evidence of a total of three exceptions to the general rule that States adopt EPA's 304(a) criteria (two from the 1990s and one more recent partial deviation), and a

12

total of two exceptions to the general rule that EPA approves such adoptions (one partial denial for Oregon, which is misleading, *supra, n.* 1, and one for chronic mercury in North Dakota). Pet. 8-9. Given that there are usually four 304(a) criteria for each of about 150 pollutants and EPA tracks all fifty States' implementation of criteria, EPA's scant evidence only further proves the Majority's conclusion.[2]

Furthermore, redressability requires only "some" reduction of the injury, not total relief of every injury. *Diamond*, 606 U.S. at 114 ("[e]ven 'one dollar'" of redress satisfies Article III). Accordingly, the Majority correctly found redressability based on its determination that "at least one State is likely" to react to updated 304(a) criteria that comply with the ESA in ways that will "likely" redress the Center's injury. Op. 29. In reality, the record shows the vast majority of states are likely to do so.

EPA's final argument — that "vacatur did not (and cannot) affect any previously approved Standards" so "[n]o relief available here will change them" — is also wrong. Pet. 17. Vacatur is not the main (much less only) relief available (or ordered) here, nor is it the sole mechanism the Center relied on to remedy its injuries in States that already adopted the 2016 criteria. Rather, the principal relief is the district court's remand to EPA to engage in ESA consultation to "insure" that the

---

[2] EPA, *National Recommended Water Quality Criteria*, epa.gov/wqc/national-recommended-water-quality-criteria-organoleptic-effects.

cadmium criteria will not jeopardize any ESA-listed species or adversely modify any critical habitat. ER-29–31. *All* States must consider the new criteria resulting from this remand within a few years as part of their CWA-mandated triennial reviews and either adopt them or provide a satisfactory explanation for not doing so. Op. 9-10. At that point, the science will be updated with the Services' biological opinions on what is necessary to protect endangered and threatened species and their habitats. 16 U.S.C. § 1536(a)(2). The CWA and the ESA prohibit EPA from approving State criteria that fail to keep pace with the science, and the CWA further requires EPA to step in and promulgate protective criteria for States that fall behind. 33 U.S.C. § 1313(c) (3)–(4); 40 C.F.R. § 131.5(a). It is not speculative to expect EPA and States to follow the law. And, when the process works as Congress mandated, species will be better protected, as will the Center's members' interests in those species. As the Majority held, that is enough for redressability.

### D. Industry Amici reinforce the Majority's standing decision.

Amici, two industry trade groups, confirm the Majority correctly found that elevated cadmium pollution is traceable to EPA's 304(a) criteria and redressable. Amici note that "[s]ome States rely heavily on EPA's [304(a) criteria]," and their members' discharge permit standards are "often developed using [304(a) criteria]," such that "their members will be impacted by the panel majority's decision in this case," because more stringent 304(a) criteria "will drive" more stringent conditions

14

in their discharge permits. Amici Br. at 1, 16, 24; Amici Mot. ¶ 5. That is consistent with what amicus Federal Water Quality Coalition has been telling EPA for years: "The recommended criteria being developed by EPA will be used by many States and authorized Tribes . . . In turn, those standards will determine the effluent limits in permits for FWQC members. The FWQC therefore has a direct interest in the recommended criteria." FWQC, Comments on Human Health Criteria (Aug. 13, 2014)[3]; *accord* FWQC, Comments on Copper Criteria (Sept. 27, 2016)[4] (noting "direct interest" because EPA's "Criteria will be considered by States . . . which in turn will change the effluent limits imposed in discharge permits). These statements describing a direct, tight, definitive chain of causation and redressability are precisely what the Supreme Court held is above and beyond what is needed to show standing. *Diamond*, 606 U.S. at 121.

## II. The Decision Does Not Implicate Any Conflict on the Triggers for ESA Consultation.

On the merits, EPA does not point to any conflict or overlooked fact. EPA cites just one case, *Marbled Murrelet v. Babbitt*, 83 F.3d 1068 (9th Cir. 1996), which the Majority distinguished based on the "altogether different" 304(a) regulatory regime and EPA's central, ongoing regulatory role over water quality standards at issue here. Op. 31-32. The Majority's decision does not break new ground in that

---

[3] regulations.gov/comment/EPA-HQ-OW-2014-0135-0137.
[4] regulations.gov/comment/EPA-HQ-OW-2016-0332-0037.

15

regard. *See, e.g.*, *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1021-24 (9th Cir. 2012) (similarly distinguishing *Murrelet* at length).

EPA also summarily rehashes its argument that ESA consultation is limited to on-the-ground projects like federal dam construction, or direct authorization thereof. Pet. 17-19. The Majority rejected this argument based on Supreme Court precedent and statutory and regulatory text. Op. 30-32 (discussing *National Association of Home Builders v. Defenders of Wildlife,* 551 U.S. 644, 668, 678 (2007)) (delegation of permitting authority is an "agency action"); 16 U.S.C. § 1536(a)(2) ("any action"); 50 C.F.R. § 402.02 (defining agency action as "all activities or programs of any kind . . ."). EPA has no rebuttal, much less authority, for why this warrants rehearing.

EPA's merits argument also conflates two distinct analytical steps: (1) whether there is an affirmative "agency action," and (2) whether that action "may affect" listed species or their critical habitats. *See* Pet. 17-19. Similarly, Amici conflate "agency action" with the scope of effects that the Services must consider during consultation. Amici Br. at 8. However, in a faithful application of the ESA's text, the case law and regulations keep the "two substantive questions" separate, recognizing there can be "agency action" with "no effect." *Karuk Tribe*, 681 F.3d at 1011; 50 C.F.R. § 402.14(a). Thus, as this Court has made clear, if the action agency finds "that its action will have no effect on listed species or critical habitat," it need

16

not consult with the Services. *California ex rel. Lockyer v. USDA*, 575 F.3d 999, 1019 (9th Cir. 2009); *see also Friends of Santa Clara River v. U.S. Army Corps of Eng'rs*, 887 F.3d 906, 925 (9th Cir. 2018) (action agency can reach "no effect" conclusion without consultation). This two-step inquiry is well established and, as the Majority explained, it forecloses EPA's absurd argument that if it has to consult over nationwide water quality criteria it will have to consult over every press release too. Op. 34.

### III. The Decision Is Specific to the CWA's 304(a) Regulatory Regime and Does Not Involve Questions of Exceptional Importance.

For all of the reasons explained above, the Majority's decision does not relax any of the limiting principles embedded in Article III or the ESA's triggers for consultation. It simply finds that those tests are met here based on the facts of the case. Such a decision does not open any litigation floodgates, as the Majority explicitly determined. Op. 34.

Even within the specific CWA 304(a) context, the Majority's decision on ESA consultation entails no exceptional sea change. Setting 304(a) criteria is all about considering nationwide scientific data on aquatic species after consulting with other relevant federal agencies. 33 U.S.C. § 1314(a). Accordingly, EPA's complaints about the burden of considering the Services' expert input on imperiled species impacts — assistance the Services have been imploring EPA to accept for decades, as codified in the agencies' Memorandum of Agreement — ring hollow. SER-190;

17

ER-261. And, contrary to EPA's arguments, the record indicates nationwide consultation, whereby the Services can provide their expert input at an early stage in the process, will be more efficient for federal and State agencies as compared to EPA's current, piecemeal practices where the Services' expertise comes late in the game. ER-261, SER-190, SER-197–98; *see also* SER-5–6 (nationwide cyanide 304(a) consultation streamlined future consultation process).

Finally, there is nothing exceptional about nationwide consultation on EPA actions. Following multiple orders from this Court and the D.C. Circuit, EPA now engages in nationwide consultation fairly regularly, including when it approves pesticide labels and issues renewable fuel standards. *See, e.g., In re Ctr. for Biological Diversity & Ctr. for Food Safety*, 53 F.4th 665, 668 (D.C. Cir. 2022); *Migrant Clinicians Network v. EPA,* 88 F.4th 830, 847 (9th Cir. 2023) (Congress "required the EPA to comply with the ESA when making pesticide registration decisions, and it is our duty to enforce Congress's command."); *Growth Energy v. EPA*, 5 F.4th 1 (D.C. Cir. 2021). EPA vigorously resisted the consultation requirement in those cases for policy reasons, just like it does here. But policy preferences "cannot override the words Congress chose," much less provide a reason for rehearing. *Watson v. Republican Nat'l Comm.,* No. 24-1260, 2026 WL 1855462, at *7 (U.S. June 29, 2026).

18

## CONCLUSION

EPA's Petition for rehearing should be denied.


RESPECTFULLY SUBMITTED this 8th day of July 2026.


s/ Claire E. Tonry
Claire E. Tonry
Smith & Lowney PLLC
2317 E. John St.
Seattle, WA 98112
Tel: (206) 860-2883
E-mail: claire@smithandlowney.com

Hannah Connor
Center for Biological Diversity
1411 K Street NW, Suite 1300
Washington, DC 20005
Tel: (202) 641-6176
E-mail: hconnor@biologicaldiversity.org

*Attorneys for Plaintiff-Appellee Center for Biological Diversity*

## CERTIFICATE OF COMPLIANCE

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

**Form 11. Certificate of Compliance for Petitions for Rehearing/Responses**

*Instructions for this form: https://www.ca9.uscourts.gov/forms/form11instructions.pdf*

**9th Cir. Case Number(s)** 23-2946

I am the attorney or self-represented party.

I certify that pursuant to Circuit Rule 40-1, the attached petition for panel rehearing/petition for rehearing en banc/response to petition is (*select one*):

- Prepared in a format, typeface, and type style that complies with Fed. R. App. P. 32(a)(4)-(6) and **contains the following number of words: 4,200.**

*(Petitions and responses must not exceed 4,200 words)*

**OR**

o In compliance with Fed. R. App. P. 32(a)(4)-(6) and does not exceed 15 pages.

**Signature** /s/Claire Tonry      **Date** July 8, 2026

20